GUY TRAYLING, Plaintiff-Appellant, v. BOARD OF FIRE AND POLICE COMMISSIONERS OF THE VILLAGE OF BENSENVILLE *et al.*, Defendants-Appellees.

Second District No. 2—94—0658

Opinion filed June 22, 1995.

4

Thomas F. McGuire and Brian A. Schroeder, both of Thomas F. McGuire & Associates, Ltd., of Long Grove, for appellant.

James R. Jenkins, of Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for appellee Michael Allison.

John C. Broihier, of DiLeonardi & Broihier, of Des Plaines, for other appellees.

JUSTICE HUTCHINSON delivered the opinion of the court:

Plaintiff, Lieutenant Guy Trayling, appeals from an order of the circuit court of Du Page County affirming the decision of the Board of Police and Fire Commissioners of the Village of Bensenville (board) to suspend plaintiff from the Village of Bensenville fire department (VBFD) for 30 days without pay. Bensenville village manager Michael Allison (Allison) filed charges against plaintiff in May 1993. Allison charged plaintiff with sexually harassing Bensenville employee Karen McGloon (McGloon) in violation of Title VII of the Civil Rights Act (Title VII)(42 U.S.C. § 2000e—2(a)(1) (1988)) and the Illinois Human Rights Act (Act) (775 ILCS 5/2—101(E) (West 1992)). Pursuant to the Illinois Municipal Code (65 ILCS 1/1—1—1 *et seq.* (West 1992)) Allison requested plaintiff be discharged (65 ILCS 5/10—2.1—17 (West 1992)). The board disciplined, but did not discharge, plaintiff. Both Allison and plaintiff filed for administrative review with the circuit court. The circuit court affirmed. Only plaintiff appeals the circuit court's order.

Plaintiff raises several issues. He contends (1) Allison as village manager lacked the authority to file charges of misconduct against plaintiff with the board; (2) Allison as village manager lacked the authority to appeal the board's decision to the circuit court; (3) as a matter of law the board erred in finding plaintiff sexually harassed McGloon; (4) the definition of sexual harassment applied by the board deprived plaintiff of his free speech rights; and (5) the definition of sexual harassment applied by the board was unconstitutionally vague and therefore violative of plaintiff's right to due process. We affirm.

The events giving rise to the present case took place largely in the office of the fire prevention bureau (bureau) of the VBFD. Plaintiff is a lieutenant with the VBFD assigned to the bureau. Lieutenant Ronald Nootbar (Nootbar) was also assigned to the bureau. In May 1991 McGloon was hired as a part-time secretary for the bureau. Both plaintiff and Nootbar were assigned to the bureau when McGloon was hired. Due to budgetary constraints McGloon was unsuccessful in her attempt to increase her hours to full-time.

McGloon testified plaintiff initiated physical contact with her on two occasions. McGloon testified that on June 12, 1992, plaintiff walked up behind her, kissed her on the cheek, and said "[g]oodbye *** have a nice weekend." The following Monday McGloon related the incident to Nootbar. She told Nootbar she was upset about plaintiff kissing her and she thought this conduct was "out of line." On direct examination, Nootbar corroborated McGloon's testimony. Fire Chief Willard Schoppe testified that on June 16, 1992, Mc-Gloon's husband Dan McGloon complained to him about this incident.

The second physical contact concerned plaintiff putting his hands on McGloon's waist. McGloon testified she was bending over a file cabinet when plaintiff approached her from behind, placed his hands on her hips, and physically moved her to the side. She stated this occurred either in June or July 1991. In a document entitled "Findings and Decision" (decision), the board determined these two instances of physical contact did not amount to sexual harassment.

The vast majority of McGloon's testimony concerned plaintiff's verbal statements and questions. At the hearing before the board Mc-Gloon testified to a number of exchanges between her and plaintiff, as well as conversations between plaintiff and Nootbar. These communications took place almost exclusively in the bureau office.

McGloon stated the comments she considered sexual harassment began a few weeks after her hiring. The first comment had to do with various "sexual aids and dildos" sent to the fire station. These sexual aids had been addressed to plaintiff at the fire station. This occurred during the tenure of the bureau's previous secretary. McGloon testified plaintiff used the word "dildo" in discussing this matter with her. He told McGloon he had instructed her predecessor to send a letter to the company responsible for the sexual aids stating plaintiff was dead.

Nootbar testified plaintiff discussed various sexual aids in Mc-Gloon's presence. He stated a "couple" of these discussions took place. Nootbar agreed these discussions took place early in the course of McGloon's employment. He testified that "periodically *** a magazine or something would come to the station in [plaintiff's] name listing movies and sex toys." While he stated the magazines were addressed to plaintiff, Nootbar did not know who ordered these publications. Nootbar testified plaintiff would look through the magazines and talk about the "vibrators in the magazines, the dildos, some other type of toys that I don't know what they're called."

McGloon testified the next incident occurred in September 1991. She stated plaintiff was talking about his ex-wife. According to Mc-Gloon, plaintiff said he and his ex-wife divorced "because she was out

[f- - - -g] some other guy." On cross-examination McGloon testified plaintiff repeated this statement on several occasions. Asked for the dates of these incidents, McGloon stated she could not recall. McGloon testified these comments occurred in the bureau office. She stated she believed Nootbar was present during some of these comments.

Nootbar corroborated McGloon's testimony. Nootbar stated plaintiff was upset about his wife not coming home for two nights. On two or three occasions Nootbar heard plaintiff say his wife was either "being [f- - - -d] by somebody else or out [f- - - -g] other guys."

The next incident took place during the first week of August 1992. McGloon testified plaintiff approached within two or three feet of her, unzipped his trousers, pulled his pants approximately four inches below his waist, tucked in his shirt, closed his trousers and then walked away. Immediately prior to unzipping his trousers plaintiff was standing 12 or 13 feet away from McGloon.

In the fall of 1992 plaintiff brought undergarments into the bureau office. According to McGloon, plaintiff brought in a box containing "lingerie" he had purchased for himself and his wife. McGloon testified plaintiff took a pair of "blue silk underwear" from the box and showed them to her. She stated plaintiff had purchased the blue silk underwear for himself.

Nootbar testified he was present when plaintiff brought in the undergarments. According to Nootbar, plaintiff showed McGloon both "some lady's lingerie" and a "pair of silk boxer shorts." He testified plaintiff asked McGloon what she thought about the undergarments. Nootbar stated McGloon told plaintiff she did not want to see the undergarments, she did not care about them, and she wanted nothing to do with them.

The next incident involved plaintiff bringing a sexually explicit videotape into the bureau office. Nootbar testified this occurred in the fall of 1992; McGloon stated this occurred in November 1992. Nootbar and plaintiff discussed the contents of the videotape in McGloon's presence. Nootbar described the videotape contents as "women having sex with dogs and horses and ponies and a man having sex with a pig." McGloon agreed the videotape depicted both men and women engaging in bestiality.

Plaintiff directly asked McGloon twice if she wished to view the videotape. Plaintiff first picked up the videotape and asked her if she would like to view the videotape. McGloon opined that it was disgusting and stated "no" she did not wish to view the videotape. Plaintiff then asked her if she wished to take the videotape home. McGloon again declined. Nootbar's testimony corroborated McGloon's description of this interchange up to this point. After McGloon declined

plaintiff's second invitation to view the videotape, she asked plaintiff whether his wife had viewed the videotape. She testified plaintiff replied his wife "had no desire to see something like that." Nootbar, however, testified plaintiff had said his wife had viewed the videotape.

At this point, according to both Nootbar and McGloon, McGloon's husband, Dan McGloon, walked into the bureau office. Dan McGloon, like his wife, is an employee of the Village of Bensenville. McGloon and Nootbar testified plaintiff told Dan McGloon the videotape contained scenes of bestiality and asked if he would like to take the videotape home to view. McGloon testified her husband stated "that's disgusting" and declined plaintiff's offer. Nootbar testified plaintiff asked Dan McGloon twice whether he wished to view the videotape. According to Nootbar, Dan McGloon declined on both occasions.

The next incident concerned a book entitled "How to Satisfy a Woman *Every Time* (and have her beg for more)." In the fall of 1992 plaintiff read a passage from this book to Nootbar in the bureau office; McGloon was present. McGloon testified plaintiff read "something out of the book about when you're with a woman and you enter a woman that you should just make her wait as long as she can even if she's begging for it." Nootbar testified on cross-examination plaintiff read from a chapter in the book entitled "The Main Event." "The Main Event" opens with an explicit passage closely resembling McGloon's recollection of the passage read by plaintiff. (See M. Hayden, How to Satisfy a Woman *Every Time* (and have her beg for more) 43 (1982).) The record indicates plaintiff, while in the bureau office, read two pages from the book. The record also indicates these pages were copied and entered as a group exhibit. No such group exhibit was included in the record before this court, although the book itself was admitted. However, based on the similarity between the reading described by McGloon and the explicit subject matter contained in the above-cited passage, it appears that the cited passage was read aloud by plaintiff in the bureau office.

Plaintiff directly questioned McGloon about the passage. According to McGloon, plaintiff asked her if she and her husband used the method described in "The Main Event." McGloon testified she laughed and said she did not have any problems or need for plaintiff's book. Nootbar testified McGloon told plaintiff she did not wish to discuss the passage and "it wasn't any of his business whether she did this or not."

McGloon testified plaintiff discussed the sexual relationship between him and his ex-wife. According to McGloon, this conversation occurred in February 1993. She testified plaintiff had stated his ex-wife did not like oral sex. McGloon also testified plaintiff had talked

about masturbation. According to McGloon, plaintiff said his ex-wife "did not like to touch herself."

McGloon and Nootbar testified to another incident involving the sexually explicit videotape. McGloon testified this incident occurred in February 1993. McGloon and Nootbar gave almost identical testimony concerning this incident. Plaintiff was relating an incident that had occurred between him and his second wife while the couple were still engaged. McGloon and Nootbar testified plaintiff had said he and his then fiancee were watching a television program about divorce. According to both McGloon and Nootbar, plaintiff said his fiancee told him if they ever divorced she would "go for the throat." Both McGloon and Nootbar testified plaintiff told them he left his fiancee without having sex, went home, watched a movie and masturbated. McGloon stated the movie plaintiff watched was the bestiality videotape. Nootbar testified plaintiff expressed the view masturbation was better than sex with a woman.

McGloon testified plaintiff also discussed the videotape in conjunction with his son. McGloon stated plaintiff had said he told his son about the videotape. According to McGloon, plaintiff informed her that two weeks after telling his son about the videotape, plaintiff discovered his son watching the videotape and masturbating.

Various other comments of a sexual nature occurred in the bureau office. Both McGloon and Nootbar testified plaintiff directly asked McGloon if she fantasized about engaging in group sex. According to McGloon this happened in the fall of 1992. McGloon testified she did not answer plaintiff's query; Nootbar testified McGloon responded by saying her fantasies were none of plaintiff's business. In the summer of 1992, according to both McGloon and Nootbar, plaintiff related an evening he had spent with his fiancee. Both Nootbar and McGloon testified plaintiff told them his fiancee opened the door to her apartment dressed in "lingerie" and proceeded, according to McGloon, to perform oral sex on him in the apartment doorway. Nootbar testified plaintiff "commented how [f- - - - -g] horny he was, she [plaintiff's fiancee] made him wait until they were done eating." Sometime following the summer of 1992, according to McGloon, plaintiff told her and Nootbar about an evening plaintiff had spent with his wife at an establishment named "The Sybaris." Nootbar stated this conversation took place sometime in 1992. According to Nootbar, plaintiff, while discussing his stay at "The Sybaris," said "he had never had so many orgasms in his life." McGloon testified plaintiff used explicit language while relating the number of times he successfully completed a sexual encounter that evening.

Plaintiff first argues Allison lacked the authority to file charges

of misconduct against plaintiff with the board. In Illinois anyone may bring misconduct charges against members of police and fire departments. (*Bloomquist v. Rehnberg* (1935), 280 Ill. App. 1 (wife of police officer may file charge); *Sherman v. Board of Fire & Police Commissioners* (1982), 111 Ill. App. 3d 1001 (private citizen alleging wrongful conduct by police officer may file charge); (*Schinkel v. Board of Fire & Police Comm'n* (1994), 262 Ill. App. 3d 310 (village mayor may file charge).) We hold that Allison possessed the necessary authority to file charges against plaintiff.

■ Plaintiff next contends Allison lacked the authority to appeal the board's decision to the circuit court. Allison does not appeal the circuit court's order. Whether Allison had the authority to appeal the board's decision, therefore, has no bearing on the outcome of the present case. The question of Allison's authority to file a complaint for administrative review is moot. Further consideration of this issue is unnecessary.

The third issue raised by plaintiff is that the board erred in finding plaintiff sexually harassed McGloon. At the outset, we note plaintiff does not argue that the board's finding he sexually harassed McGloon did not constitute cause for suspension. Plaintiff, rather, only argues the board erroneously determined he committed sexual harassment. We will, therefore, only discuss whether the board erred in finding plaintiff committed sexual harassment; we will not address whether this finding constituted substantial misconduct justifying plaintiff's suspension.

■ Our role in reviewing a decision of an administrative board is limited. Factual findings of an administrative board are "held to be prima facie true and correct." (735 ILCS 5/3—110 (West 1992).) Factual findings are against the manifest weight of the evidence only when it is clearly evident the board should have reached an opposite conclusion. (*Village of Elk Grove Village v. Illinois State Labor Relations Board* (1993), 245 Ill. App. 3d 109, 115.) Additionally, we are allowed to neither reevaluate the credibility of the witnesses who testified before the board (*Jackson v. Board of Review* (1985), 105 Ill. 2d 501, 513), nor substitute our judgment for that of the board (*Abrahamson v. Illinois Department of Professional Regulation* (1992), 153 Ill. 2d 76, 88). However, a board's determination of questions of law is not accorded the same deference as its findings of fact. (*Nichols v. Department of Employment Security* (1991), 218 Ill. App. 3d 803, 809-10.) As a result, we are not bound by a board's legal determination. *City of Freeport v. Illinois State Labor Relations Board* (1990), 135 Ill. 2d 499, 507.

■ Plaintiff asserts because the board concluded the elements

necessary to constitute sexual harassment existed, the board's finding of sexual harassment is a legal determination. We disagree. In finding plaintiff sexually harassed McGloon the board made several factual findings. If every application of the law to the facts resulted in a legal determination, there would be few findings of fact. The correctness of the construction of the law applied by an administrative agency is a question of law. (*Sandburg Faculty Association v. Illinois Educational Labor Relations Board* (1993), 248 Ill. App. 3d 1028, 1034.) Whether the evidence as evaluated and weighed by an administrative agency demonstrates facts amounting to a violation of that construction of the law is a question of fact. We, therefore, determine the definition of sexual harassment applied by the board is a question of law and whether plaintiff sexually harassed McGloon is a question of fact.

■ Title VII and the Act set forth similar definitions of sexual harassment. The Act makes sexual harassment a civil rights violation (775 ILCS 5/2—102(D) (West 1992)). According to section 5/2—101(E) of the Act:

> " '[s]exual harassment' means any unwelcome sexual advances or requests for sexual favors or any conduct of a sexual nature when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of substantially interfering with an individual's work performance *or* creating an intimidating, hostile or offensive working environment." (Emphasis added.) (775 ILCS 5/2—101(E) (West 1992).)

Subparts (1) and (2) of section 2—101(E) define what has been called "*quid pro quo* sexual harassment"; subpart (3) refers to what is commonly known as "hostile environment sexual harassment." (See *Board of Directors v. Human Rights Comm'n* (1987), 162 Ill. App. 3d 216, 219.) The Federal prohibitions of sexual harassment are found in section 703(a)(1) of Title VII (see 42 U.S.C. § 2000e—2(a)(1) (1988)) and in section 703(a)(1)'s accompanying regulations (see 29 C.F.R. § 1604.11 (1985)). Title VII prohibits, *inter alia*, discrimination on the basis of gender. (*Board of Directors*, 162 Ill. App. 3d at 219.) Adopting guidelines promulgated by the Equal Employment Opportunity Commission, the Supreme Court has found that under Title VII sexual harassment is a form of prohibited gender discrimination. The Court has held verbal or physical conduct of a sexual nature "constitutes prohibited 'sexual harassment,' whether or not it is directly linked to the grant or denial of an economic *quid pro quo*, where 'such conduct

has the purpose or effect of unreasonably interfering with an individual's work performance *or* creating an intimidating, hostile, or offensive working environment.' " (Emphasis added.) (*Meritor Savings Bank v. Vinson* (1986), 477 U.S. 57, 65, 91 L. Ed. 2d 49, 58-59, 106 S. Ct. 2399, 2404-05, quoting 29 C.F.R. § 1604.11(a)(3) (1985).) We note while the prohibition of sexual harassment found in the Act closely parallels that found in Title VII, and therefore examination of Federal law is appropriate (*Faulkner-King v. Department of Human Rights* (1992), 225 Ill. App. 3d 784, 788), our Act need not be applied in lockstep with the Supreme Court's construction of Title VII (see *Geise v. Phoenix Co. of Chicago, Inc.* (1994), 159 Ill. 2d 507, 518 (stating employers are strictly liable under the Act for sexual harassment committed by their employees even though additional grounds for employer liability may be required under Title VII)). With this in mind, after examining *Meritor* we determine hostile environment sexual harassment exists under the Act when (1) sexual verbal or physical conduct; (2) unwelcome by the individual alleging sexual harassment; (3) has the purpose or effect of; (4) either (a) substantially interfering with the individual's work performance, or (b) creating an intimidating, hostile, or offensive working environment.

The board applied a proper definition of sexual harassment. In its decision the board found plaintiff "guilty of misconduct in that he sexually harassed \*\*\* McGloon by engaging in unwelcome verbal conduct of a sexual nature creating an offensive working environment for [McGloon]." This formulation of sexual harassment is consistent with the definitions announced in *Meritor* and found in the Act.

■ Plaintiff argues the board erred because the record contains no evidence plaintiff's conduct was motivated by McGloon's gender. We disagree. An individual's intent or motivation only exists in the mind of that individual. Proof of intent or motivation, therefore, originates either directly from the individual or arises by inference based on the individual's conduct as revealed by the evidence. In criminal proceedings, intent is often shown by inference. (See *People v. Lucas* (1992), 151 Ill. 2d 461, 477.) Likewise in a sexual harassment case, an individual's motivation for conduct can be determined by drawing inferences from the evidence. We find the record as a whole supports an inference plaintiff's conduct was gender-motivated.

■ In *Harris v. Forklift Systems, Inc.* (1993), 510 U.S. 17, 126 L. Ed. 2d 295, 114 S. Ct. 367, the Supreme Court further defined how courts should determine whether conduct is "severe or pervasive" enough "to create an objectively hostile or abusive work environment" under Title VII. The Supreme Court held Title VII does not

require a showing of concrete psychological harm. (*Harris*, 510 U.S. at 22, 126 L. Ed. 2d at 302, 114 S. Ct. at 370.) The Supreme Court also held sexual harassment under Title VII only exists when the working environment is hostile or abusive when viewed both objectively and subjectively. (*Harris*, 510 U.S. at 22, 126 L. Ed. 2d at 302, 114 S. Ct. at 370.) Under Title VII, therefore, the working environment must be hostile or abusive to a reasonable person and the individual alleging sexual harassment must have actually perceived the environment to be hostile or abusive.

■ We are persuaded that the Supreme Court's decision in *Harris* should be applied to sexual harassment claims brought pursuant to the Act. A showing of concrete psychological harm is not a prerequisite to finding sexual harassment under the Act. We are also persuaded to believe there is value in requiring a working environment to be intimidating, hostile, or offensive both objectively and subjectively. Such a requirement deters claims of sexual harassment based exclusively on either a person's sense of propriety and decorum, which varies greatly from one individual to the next, or a desire to retaliate based on circumstances unrelated to any alleged sexual misconduct. Determining whether conduct amounts to sexual harassment requires examination of the totality of the circumstances. (*Harris*, 510 U.S. at 22, 126 L. Ed. 2d at 302, 114 S. Ct. at 370-71 (setting forth nonexhaustive list of factors to be considered); see *Doe v. R.R. Donnelley & Sons Co.* (7th Cir. 1994), 42 F.3d 439, 444 (and cases cited therein); see also *Illinois v. Human Rights Comm'n* (1989), 178 Ill. App. 3d 1033, 1049.) Still, we recognize *Harris* does not better define what type of behavior constitutes sexual harassment. (*Harris*, 510 U.S. at 23-24, 126 L. Ed. 2d at 303-04, 114 S. Ct. at 371-72 (Scalia, J., concurring).) *Harris* does, however, limit the situations in which sexual harassment can be found to those in which the specific individual's perceptions of the working environment comport with what a reasonable person would find to be intimidating, hostile, or offensive based on the totality of the circumstances. For this reason we adopt *Harris*.

■ Plaintiff contends McGloon did not subjectively perceive her working environment as offensive. Because the board found McGloon desired to increase her hours, plaintiff argues she could not have subjectively believed she worked in an offensive environment. We disagree. Simply because McGloon wished to become a full-time employee does not foreclose the possibility she subjectively perceived her working environment as offensive. (See *King v. Hillen* (F. Cir. 1994), 21 F.3d 1572, 1583 ("That women who are the objects of discriminatory behavior because of their sex are able to maintain

satisfactory job performance is not grounds for denigrating their concerns").) A finding that McGloon subjectively believed the bureau office was an offensive working environment is amply supported by the record and not against the manifest weight of the evidence.

■ Based on *Harris*, plaintiff urges when deciding what is objectively reasonable "[t]he workplace environment and the individuals who function there must be considered." We disagree. Plaintiff would require us to take into account the idiosyncracies, predilections, and personalities of specific members of an individual's working environment, as well as stereotypical notions of the nature of different categories of working environments. Plaintiff's formulation of *Harris* would confuse normalcy with reasonableness. Just because certain conduct is commonplace, and therefore "normal" within the context of a specific workplace, does not render the conduct reasonable. *Harris*, instead, envisions a reasonable person whose view of what is intimidating, hostile, or offensive is uniform throughout all workplaces. Any other interpretation means the strength of protection against sexual harassment afforded by Title VII and the Act is dependent on the vagaries of where and with whom individuals work. This cannot be the case. Title VII and the Act should equally protect individuals from sexual harassment whether they work in a firehouse or a coffee house.

■ Plaintiff argues McGloon's perception of her work environment was not objectively reasonable. The record demonstrates a continuing pattern of sexual conduct by plaintiff. Some of this conduct, such as the incidents involving the bestiality videotape, discussion of sexual aids, the reading from "The Main Event" and plaintiff's questioning of McGloon's sexual fantasies, were specifically directed towards McGloon. McGloon and Nootbar largely corroborated one another's account of plaintiff's conduct. Whether McGloon found plaintiff's conduct unwelcome depended on how credible the board found both her and Nootbar's testimony. We may not substitute our own credibility determination for the board's. A finding that a reasonable person would have perceived the bureau office to be an offensive working environment is supported by the record. Based on the foregoing, the board's finding that plaintiff committed sexual harassment is not against the manifest weight of the evidence.

Switching tactics, plaintiff argues the definition of sexual harassment applied by the board deprived him of his free speech rights under the Illinois and Federal Constitutions. In support of this proposition plaintiff cites *Pickering v. Board of Education of Township High School District 205* (1968), 391 U.S. 563, 574, 20 L. Ed. 2d 811,

820, 88 S. Ct. 1731, 1737-38 (stating that a public official's speech on a matter of public concern is protected under the first amendment). Citing *Miller v. California* (1973), 413 U.S. 15, 37 L. Ed. 2d 419, 93 S. Ct. 2607, plaintiff states public employees may not engage in obscenity. Plaintiff argues (1) he is a public employee and under *Pickering* all of his speech on matters of public concern is protected; (2) sexual matters are of public concern; therefore (3) he can be punished for his conduct only if it amounts to obscenity.

 █ This argument reveals a fundamental misunderstanding of the laws of obscenity, sexual harassment, and public employee speech. Obscenity is without constitutional protection because it is " 'of such slight social value as a step to the truth.' " (Emphasis omitted.) (*Roth v. United States* (1957), 354 U.S. 476, 485, 1 L. Ed. 2d 1498, 1507, 77 S. Ct. 1304, 1309, quoting *Chaplinsky v. New Hampshire* (1942), 315 U.S. 568, 572, 86 L. Ed. 1031, 1035, 62 S. Ct. 766, 769.) Prohibitions against sexual harassment are generally applicable laws. While the speech of public employees is constitutionally protected, sovereigns have broader regulatory powers over an employee's expression than that of the general citizenry. (*Waters v. Churchill* (1994), 511 U.S. 661, 671-72, 128 L. Ed. 2d 686, 697-98, 114 S. Ct. 1878, 1886, citing *Pickering*, 391 U.S. at 568, 20 L. Ed. 2d at 817, 88 S. Ct. at 1735.) *Pickering*, therefore, narrows the universe of protected public employee speech compared to the speech of private citizens. It would be absurd if *Pickering* created a safe harbor for the commission of sexual harassment by public employees (unless the employee's conduct also amounted to obscenity under *Miller/Roth*), while an individual employed by a private entity would be subject both to the Act and Title VII. We decline to so hold.

 Finally, plaintiff asserts the definitions of sexual harassment contained in both the Act and Title VII are unconstitutionally vague. Plaintiff argues the offense is unconstitutionally vague because it is defined by the victim. This is incorrect. As we have stated, conduct must be considered sexually harassing from both a subjective and objective view. Plaintiff requests we invalidate the Act's prohibition against sexual harassment (and by implication the protections of Title VII as well). He, however, cites no authority holding a State, or the Federal, prohibition unconstitutional. We, therefore, decline plaintiff's invitation.

For the foregoing reasons the judgment of the circuit court of Du Page County is affirmed.

Affirmed.

DOYLE and COLWELL, JJ., concur.