THOMAS O'SULLIVAN, Petitioner-Appellee and Cross-Appellant, v. BOARD OF COMMISSIONERS OF THE COOK COUNTY BOARD *et al.*, Respondents-Appellants and Cross-Appellees.

First District (1st Division)  Nos. 1—96—1296, 1—96—1510 cons.

Opinion filed November 10, 1997.—Rehearing denied December 22, 1997.

Jack O'Malley, State's Attorney, of Chicago (Patricia M. Shymanski, John J. Murphy, and Sophia Lopez, Assistant State's Attorneys, of counsel), for appellants.

Joseph V. Roddy, of Chicago (Tamara L. Cummings and Joseph V. Roddy, of counsel), for appellee.

JUSTICE BUCKLEY delivered the opinion of the court:

This appeal involves the review of an administrative determination. On August 8, 1993, complaints were filed by Oak Forest Hospital of Cook County (the Hospital) and three of its employees against Thomas O'Sullivan (O'Sullivan). Henry Townes (Townes), the director of the Cook County Department of Human Resources, held a pre-disciplinary hearing on August 30, 1993. Thereafter, Townes

discharged O'Sullivan by letter effective September 3, 1993. A discharge appeal hearing was held on March 11, 1994, at which hearing officer Patricia Dixon presided on behalf of the County of Cook/Board of Commissioners of Cook County/Bureau of Human Resources (collectively, the County). On September 26, 1994, the County sustained O'Sullivan's discharge from his supervisory position as chief engineer for the Hospital. O'Sullivan filed a writ of *certiorari*. On September 28, 1995, the circuit court, after hearing oral arguments, remanded the case to the County ordering imposition of a penalty less than discharge. On March 25, 1996, the circuit court entered a final order affirming the County's entry of a sanction of demotion without back pay or related benefits. The County appeals, seeking reversal of the circuit court's orders of September 28, 1995, and March 25, 1996, and seeking entry of an order reinstating the County's sanction of discharge. O'Sullivan cross-appeals, seeking reversal of the circuit court's order of March 25, 1996.

The issues presented on appeal are: (1) whether the County's findings of fact were against the manifest weight of the evidence; (2) whether the County's decision to discharge was unreasonable, arbitrary, or unrelated to the requirements of service; and (3) whether the trial court properly affirmed the decision of the County whereby O'Sullivan was demoted and reinstated without back pay or related benefits.

O'Sullivan was suspended from his job at the Hospital on August 8, 1993, as a result of complaints filed by three employees, Carolyn Klimp, Laura Finn, and William Belle. A pretermination hearing was held on August 30, 1993. At the hearing, Townes heard the complaints of Finn and Klimp. Because Belle was out of town, Townes was presented with Belle's written statement. After considering the facts presented at the hearing, Townes discharged O'Sullivan by letter effective September 3, 1993. According to the letter, O'Sullivan was charged with violation of Cook County's policy prohibiting sexual harassment, abusive behavior toward employees, and less than satisfactory work performance. O'Sullivan appealed.

On March 11, 1994, the County held a discharge appeal hearing. The Hospital presented the testimony of Lathitha Chandrashekar, Finn, Klimp, and Belle. The County also heard testimony on O'Sullivan's behalf from Thomas Kennedy, Gerald Donnelly, and O'Sullivan.

The following testimony was elicited at the hearing. Chandrashekar testified that she was asked by the female Hospital director to investigate the charges of harassment alleged against O'Sullivan. Chandrashekar testified that she spoke with the

4

complainants, department staff, and O'Sullivan. Chandrashekar wrote up her findings and presented them to Townes. She stated that she never told O'Sullivan to stop his conduct.

Finn testified that she had been an employee of the Hospital since July 1983 and had transferred into O'Sullivan's department in 1990. She testified that O'Sullivan expressed to her in certain ways that she was not a welcome addition. She testified that he assigned her to very difficult and unpleasant jobs so that she would want to leave. Finn stated that she felt if she completed her assignments, O'Sullivan would see that she was doing her work and, therefore, she wouldn't have any further problems with him.

Finn testified that O'Sullivan had a tendency to cut out jokes and pictures and tape them up. She stated that one picture was of a woman pulling a plow and that O'Sullivan had typed a caption on it that read "that's the way it should be today." She also stated that O'Sullivan had a habit of making comments that he thought were humorous. He made comments regarding women taking advantage of men when they go out to restaurants and how women never pay their fair share. Finn testified that O'Sullivan had two Art Institute pictures on his office wall of nude women. She testified that once when she was in his office for a meeting he asked her if she liked his artwork. In response, she just shook her head. Finn stated that she believed it was in her best interest not to rock the boat with O'Sullivan, to try to go along and not cause problems so that the work place would be more "settled."

Finn testified that in 1992, when she was pregnant, O'Sullivan assigned her to difficult jobs which entailed walking alone at the tops of ropes, working in the tunnels alone and working with the laundry oiler. She stated that while she was pregnant O'Sullivan asked her if she needed a red flag taped to her stomach. She told him she didn't think that was funny and about three weeks later he asked her the same question again. About six months into her pregnancy, Finn and O'Sullivan met with her union representative about the difficulty of her assignments. Finn requested a transfer to the computer room. O'Sullivan asked her to think about any other jobs she could do during her last trimester and he said that he would think about the transfer. While O'Sullivan never expressly denied Finn's transfer request, her assignment was not changed until after O'Sullivan left. Finn stated that this time period was very stressful for her and that she would get up in the morning and not want to go to work for fear of what else would be done to her.

Finn testified that after having worked in the boiler room for two years, she became eligible to take an engineer's test given by the City

of Chicago. A prerequisite to taking the exam, however, is a letter from the chief engineer verifying that the candidate has worked on high steam pressure boilers for two years. When Finn asked O'Sullivan for the letter, O'Sullivan told her that she had to take a test first. Finn testified that O'Sullivan had previously never required anyone to take a test before issuing the letter. Finn went to the associate administrator, John O'Shaughnessy, who is O'Sullivan's boss and also Finn's father, and complained to him about this new requirement. O'Shaughnessy told Finn that she did not have to take a test. After Finn told O'Sullivan about her conversation with O'Shaughnessy, O'Sullivan issued the letter.

Finn testified that she complained to O'Shaughnessy about O'Sullivan on at least two occasions before the letter incident. Finn stated that O'Shaughnessy told her that he didn't want to interfere because there might be a perception of bias or prejudice and that it might cause problems. Finn testified that, as a result, she felt that there was no one to turn to. She stated that, while she knew she could file a grievance with the union representative, she believed it would result in retaliation by O'Sullivan and even more problems for her at work. Finn testified that when Dr. Rush joined the Hospital, she had open meetings with the employees. At that point, Finn felt as if she could no longer complete a day at work and so she decided to speak with Dr. Rush about O'Sullivan's conduct.

On cross-examination, Finn testified that although she felt offended by O'Sullivan, she did make attempts to be friendly with him. The copy machines were located outside his office so if she had to make copies she would stand by his door and talk to him. Finn stated that while her working relationship with O'Sullivan was intolerable, she believed it was in her best interest to be nice to him so that hopefully things would change.

Klimp, a mechanical assistant in heating and operating for the Hospital, and Finn's sister, testified that she began working at the Hospital in 1989 and was the first permanent woman in O'Sullivan's department. She testified that during a St. Patrick's Day party, O'Sullivan approached her and said, "And to think Jerry Donnelly did not want women in this department." Klimp responded, "Jerry Donnelly was not alone, was he?" O'Sullivan laughed and walked away. Klimp testified that the incidents had gradually progressed from there. For example, Klimp testified that when she was crabby, O'Sullivan referred to her menstrual cycle. Additionally, O'Sullivan asked Klimp to tell him when Dr. Rush had her period so that he would know when to avoid her.

Klimp also testified regarding the two Art Institute pictures in

O'Sullivan's office. She testified that once while she was in O'Sullivan's office discussing work, O'Sullivan went up to one of the pictures and began brushing off the breasts and rear end of the nude woman in the picture. Klimp stated that this behavior, as well as O'Sullivan's references to her menstrual cycle, was sexually offensive to her.

Klimp also testified regarding the photo of the woman tied to the plow. Klimp stated that while she didn't know if O'Sullivan was the one who hung the photo on the file cabinet outside his office, O'Sullivan did show it to her. Klimp told O'Sullivan that she did not think the photo was funny and told O'Sullivan that she was going to send it to Dr. Rush. She further testified that she found the photo to be demoralizing to women.

Klimp testified that, before the charges were brought, she told O'Sullivan that he could not continue to treat people the way he was treating them. She informed O'Sullivan that Dr. Rush was asking about how people were being treated and told him that he needed to change. Klimp stated that O'Sullivan responded, "I will quit first and learn to enjoy my retirement." Klimp testified that she never complained to anyone other than Dr. Rush about O'Sullivan's actions.

Belle, a black mechanical assistant at the Hospital, testified that he had worked in O'Sullivan's department for about four years. Belle, like Finn, wanted to take the engineer's test administered by the City of Chicago and requested the standard letter verifying his two years of work experience in the boiler room from O'Sullivan. O'Sullivan refused to write the letter and told Belle that he was not smart enough to be an engineer, that he was already paid enough money, and that he had an arrogant attitude. O'Sullivan told Belle that he would never write the letter for him.

Belle testified that his problems with O'Sullivan began during Belle's first year on the job when O'Sullivan wrote him up for excessive absenteeism. Belle testified that he was not absent on the days for which O'Sullivan wrote him up. After Belle investigated his personnel records and confirmed that the disciplinary letter was untrue, the letter was removed from his file and discarded.

Belle testified that O'Sullivan would post pictures of black criminals who resembled Belle or who had a name similar to Belle's on the bulletin board for all the engineers to see. Belle testified that O'Sullivan made comments about the school sweaters that Belle wore to work and referred to them as gang symbols. Belle testified that O'Sullivan made comments about the neighborhood Belle lived in. O'Sullivan also mocked Belle for carrying a pager and, in front of other employees, asked Belle if he was doing something illegal.

Belle also testified to an incident when, after working in a particularly dirty area, his clothes, face and hands became covered with a lot of black dirt and soot. O'Sullivan approached him and in front of other engineers stated, "I can't tell if you're dirty or if you're black." Belle became very upset and walked away.

Belle also testified that once, after hearing O'Sullivan say that he was having a dinner party, Belle asked O'Sullivan if he could come over for dinner. O'Sullivan responded, "Yeah, you can come over for dinner, we'll be serving mixed vegetables." Belle testified that the comment referred to blacks and whites getting together.

Belle also testified to an incident involving O'Sullivan's instruction to him to put a plastic liner in an incinerator. Because the incinerator was about 20 feet long and 7 feet wide and because it was windy, Belle couldn't complete the task alone. Belle testified that he asked some white engineers to help him and they refused. O'Sullivan directed Belle to have Kenneth Smith, another black mechanical assistant, help him. Belle asked Smith to help him but since Smith was not allowed to leave the computer room without specific orders from O'Sullivan Smith told Belle he would have to wait. When O'Sullivan saw that Belle had not completed the job, O'Sullivan wrote up Belle, Smith and another black engineer. O'Sullivan did not write up any of the white employees involved in the incident. Belle testified that it later took eight men to complete the task.

Belle testified that he complained to Kennedy and Donnelly, his direct supervisors, about O'Sullivan's racial comments and the way O'Sullivan treated him. However, since O'Sullivan was the "big boss" Belle was always referred back to him. Belle attempted to talk to O'Sullivan about his conduct. Belle did not file a grievance against O'Sullivan over O'Sullivan's conduct because he did not feel it would help. Belle went to see Dr. Rush after O'Sullivan mockingly told him that his evaluation had improved two points when it actually had only improved two-tenths of a point.

In defense, O'Sullivan presented the testimony of Thomas Kennedy, chief engineer and former assistant to O'Sullivan. Kennedy testified that he has worked for the Hospital for 17 years. Kennedy testified that neither Finn, Klimp nor Belle had ever complained to him about O'Sullivan. The defense also presented the testimony of Gerald Donnelly, assistant chief engineer, who worked as O'Sullivan's assistant for four years. Donnelly testified that he supervised Finn, Klimp and Belle and that none of them had ever complained to him about O'Sullivan's conduct.

O'Sullivan testified in his own defense. O'Sullivan stated that he worked for the County for close to 23 years. He stated that during

that time he received an award for saving the County money and that he does not have any reprimands in his file. O'Sullivan testified that O'Shaughnessy was his boss and that they spoke on a daily basis. He testified that O'Shaughnessy never told him that his daughters, Finn and Klimp, found O'Sullivan sexually offensive. O'Sullivan stated that neither Klimp nor Finn ever complained to him about his conduct and that on many occasions they would walk into his office and begin conversations.

O'Sullivan stated that he vaguely recollects comments made to Finn during her pregnancy about a red flag and comments made to Klimp about the Hospital director's menstrual cycle. O'Sullivan also testified that he does recall removing tape residue from the picture of the nude woman in his office while Klimp was present. He also testified that neither Finn nor Klimp ever complained about the photos. O'Sullivan testified that he did not show a picture of a woman tied to a plow to anybody. O'Sullivan testified that he never received any reprimands from anyone regarding sexual harassment. O'Sullivan stated that if Finn or Klimp had asked him to stop making comments that they thought were offensive he would have stopped.

O'Sullivan also denied posting pictures of black convicts and putting Belle's name on them; however, he did see one picture posted with Belle's name on it. O'Sullivan does not recall Belle ever complaining about such pictures. He also stated that Belle never complained to him about offensive comments.

O'Sullivan stated that the reason he told Finn she would have to take a test to get the recommendation letter was because he wanted to make sure she was qualified and that he had considered making testing a prerequisite to getting the letter. O'Sullivan stated that he denied the letter to Belle because Belle's evaluations were low.

On September 26, 1994, the County issued its written decision finding that O'Sullivan's behavior created a hostile working environment justifying his immediate discharge. The County noted that employee abuse, of any kind, is a major rule of conduct violation. O'Sullivan filed a petition for *certiorari*.

The trial court heard oral arguments on September 6, 1995. On September 28, 1995, the trial court remanded the case to the County with instructions to impose a penalty less than discharge. On February 27, 1996, the County entered a sanction of demotion to the position of fireman's helper, with no supervisory responsibilities and no back pay. On March 25, 1996, the trial court affirmed the County's sanction and entered a final order. The County appeals from the trial court's orders of September 28, 1995 and March 25, 1996, seeking to reverse the orders of the trial court and seeking entry of an order to

reinstate the County's sanction of discharge. O'Sullivan appeals the trial court's order of March 25, 1996.

■ Judicial review of an administrative agency's decision to discharge a public employee involves a two-step analysis. The first step requires the reviewing court to determine whether the agency's decision is contrary to the manifest weight of the evidence (*Walsh v. Board of Fire & Police Commissioners*, 96 Ill. 2d 101 (1983); *Caliendo v. Martin*, 250 Ill. App. 3d 409 (1993)) while bearing in mind that the agency's findings are deemed *prima facie* true and correct. 735 ILCS 5/3—110 (West 1992). The second step requires the reviewing court to determine whether the agency's findings of fact support the conclusion that sufficient cause for discharge exists. *Walsh*, 96 Ill. 2d at 105; *Caliendo*, 250 Ill. App. 3d at 415.

The County's first contention is that its findings of fact were not against the manifest weight of the evidence and should have been affirmed by the trial court. If there is evidence in the record that supports the administrative agency's decision, the decision must be sustained on judicial review. *Yeksigian v. City of Chicago*, 231 Ill. App. 3d 307 (1992). Because the weight of the evidence and the credibility of the witness are determined by the agency, there need only be some competent evidence in the record to support the decision. *Iwanski v. Streamwood Police Pension Board*, 232 Ill. App. 3d 180 (1992). The fact that an opposite conclusion is reasonable or that the reviewing court might have ruled differently based on the same evidence does not justify reversal of the findings of the administrative agency. *King v. Justice Party*, 284 Ill. App. 3d 886, 888 (1996). Because we find there is evidence in the record to support the County's findings, the findings are not against the manifest weight of the evidence and should have been affirmed by the trial court.

■ Cook County rules and regulations governing employee conduct specifically prohibit employees from mistreating or abusing employees "in any manner, including loud, abusive, insolent, or rude behavior, and racial or ethnic slurs." Oak Forest Hospital Rules and Regulations Governing Employee Conduct, § 2(B)(1) (1987). Cook County executive order 91—4 specifically prohibits sexual and racial harassment in employment. Section 2(A)(2)(c) of executive order 91—4 defines sexual harassment to include "activities such as unwelcome sexual advances *** or activities of a sexual nature *** hav[ing] the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment." Cook County Exec. Order No. 91—4, § 2(A)(2)(c) (1992). This language mirrors the definition of sexual harassment found in the Illinois Human Rights Act. 775 ILCS 5/2—101(E) (West

1992). Title VII of the Civil Rights Act of 1964 also prohibits discrimination on the basis of gender and prohibits discriminatory conduct that creates a hostile work environment. 42 U.S.C.S. § 2000e—2(a) (1989); *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993).

In addition, the County's rules and regulations expressly prohibit harassment on the basis of any other protected status, including race. In particular, section 2(A)(3) of executive order 91—4 provides that "[s]lurs and other verbal or physical conduct relating to a person's membership in a protected status constitutes harassment when this conduct *** has the purpose or effect of creating an intimidating, hostile or offensive working environment *** or unreasonably interfer[es] with an individual's work performance *** or *** adversely effects an individual's employment environment." Cook County Exec. Order No. 91—4, § 2(A)(3) (1992).

Cook County rules and regulations also prohibit employees from "fail[ing] to follow instructions or fail[ing] to work in accordance with County policies, procedures and/or practices" and from "perform[ing] at less than a satisfactory level in any job classification." Oak Forest Hospital Rules and Regulations Governing Employee Conduct, §§ 2(B)(9), (B)(24) (1987).

■ O'Sullivan contends that because the definition of sexual harassment applied by the Hospital closely parallels the language contained in the Illinois Human Rights Act (775 ILCS 5/2—101(E) (West 1992)), as well as the prohibition against sexual harassment found in Title VII (42 U.S.C.S. § 2000e—2(a) (1989)), it is appropriate to look to both federal and Illinois law for interpretation. However, we note at the outset that this case does not involve the question of whether O'Sullivan's conduct violated federal law. Rather, the question is whether O'Sullivan's conduct violated his employer's rules and policies. Moreover, Illinois courts have noted that "[the Illinois] Act need not be applied in lockstep with the Supreme Court's construction of Title VII." *Trayling v. Board of Fire & Police Commissioners*, 273 Ill. App. 3d 1, 11 (1995), citing *Geise v. Phoenix Co. of Chicago, Inc.*, 159 Ill. 2d 507, 518 (1994) (stating that, under the Illinois Human Rights Act, employers are strictly liable for acts of sexual harassment committed by their employees even though Title VII may require additional grounds). Additionally, the County asserts that based on *Chalmers v. Quaker Oats Co.*, 859 F. Supp. 1149 (N.D. Ill. 1994), a company can interpret its own sexual harassment policy more stringently than federal law.

O'Sullivan relies solely on federal case law and contends that the alleged incidents complained of are isolated incidents and are not

sufficient to create a hostile work environment under the standard of *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993). In *Harris*, the Supreme Court stated that Title VII is violated when the workplace is permeated with discriminatory behavior that is sufficiently severe or pervasive to create a discriminatorily hostile or abusive working environment. *Harris*, 510 U.S. at 21, 126 L. Ed. 2d at 301, 114 S. Ct. at 370 (reaffirming standard stated in *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986)). Under *Harris*, there must be an objectively hostile or abusive environment and the victim must also subjectively perceive the environment as hostile or abusive. *Harris*, 510 U.S. at 21-22, 126 L. Ed. 2d at 302, 114 S. Ct. at 370. In determining whether the environment is objectively hostile, the totality of the circumstances should be analyzed. *Harris*, 510 U.S. at 23, 126 L. Ed. 2d at 302-03, 114 S. Ct. at 371. The Court listed the following factors to be considered, stating that no single factor is required: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. *Harris*, 510 U.S. at 23, 126 L. Ed. 2d at 302-03, 114 S. Ct. at 371.

O'Sullivan contends that there are at most four incidents attributable to O'Sullivan: the pictures in his office, the comment regarding the Hospital Director's menstrual cycle, the conversation at the St. Patrick's Day party, and the remark about the red flag. O'Sullivan argues that this conduct does not create a hostile work environment under the *Harris* test. O'Sullivan cites *Saxton v. American Telephone & Telegraph Co.*, 10 F.3d 526 (7th Cir. 1993), and *Weiss v. Coca Cola Bottling Co.*, 990 F.2d 333 (7th Cir. 1993), for examples of behavior that do not rise to sexual harassment under Title VII.

O'Sullivan likewise contends that the incidents of which Belle complained were isolated and did not rise to a level of racial discrimination. O'Sullivan cites *Bolden v. PRC Inc.*, 43 F.3d 545, 550-51 (10th Cir. 1994), and *Hong v. Children's Memorial Hospital*, 993 F.2d 1257, 1265 (7th Cir. 1993), for the proposition that sporadic racial slurs are not enough to support a claim under Title VI. O'Sullivan argues that his refusal to sign Belle's letter of recommendation to take the engineer's test was because of Belle's low performance. As for the pictures of ex-convicts, O'Sullivan denied that he posted the pictures. O'Sullivan asserts that the two remarks about being "dirty" and serving "mixed vegetables" do not rise to a level of a racial slur.

Again, we emphasize that the question for this court to decide is

not whether O'Sullivan's conduct violated federal law. The issue we must address is whether the record supports the County's determination. The County, after hearing testimony from all parties, determined that O'Sullivan violated the County's rules and regulations. The record supports a finding of employee abuse based on racial and sexual harassment as well as less than satisfactory work performance. There is evidence in the record that O'Sullivan's course of conduct in posting pictures of females, reference to female employees' menstrual cycles, assigning progressively difficult tasks to a pregnant employee, and his refusal to issue a routine letter of verification of work experience absent a test constitutes "conduct of a sexual nature" that could be degrading or offensive to a reasonable person under an objective standard and, therefore, satisfies the *Harris* test. O'Sullivan has failed to cite any Illinois law in support of his argument to the contrary.

Since we find that the County's finding that O'Sullivan violated the County's policy prohibiting sexual harassment, employee abuse, and less than satisfactory work performance is supported by the manifest weight of the evidence, the next issue for this court to resolve is whether the sanction of discharge was arbitrary, unreasonable or unrelated to the requirements of service.

■ Cause for discharge has been defined by the Illinois Supreme Court as "some substantial shortcoming which renders continuance in [the employee's] office or employment in some way detrimental to the discipline and efficiency of the service and something which the law and a sound public opinion recognize as a good cause for [the employee] not longer occupying the place." *Fantozzi v. Board of Fire & Police Commissioners*, 27 Ill. 2d 357, 360 (1963); see also *Caliendo v. Martin*, 250 Ill. App. 3d 409, 418 (1993). In reviewing the County's decision to discharge O'Sullivan, the question is not whether this court would decide upon a more lenient sanction than discharge were it to determine initially what sanction would be appropriate. *Sutton v. Civil Service Comm'n*, 91 Ill. 2d 404, 411 (1982). Rather, the question is whether this court could find, after considering the circumstances presented, that the County acted unreasonably or arbitrarily in discharging O'Sullivan, or selected a type of discipline unrelated to the needs of the department. *Sutton*, 91 Ill. 2d at 411; *Calomino v. Board of Fire & Police Commissioners*, 273 Ill. App. 3d 494, 499 (1995).

■ The County contends that the trial court improperly substituted its judgment for that of the County when it reversed the sanction of discharge and remanded for imposition of a penalty less than discharge. We agree. The trial judge, in reviewing the County's decision to discharge O'Sullivan, stated that it was necessary to "balance

the equities in these matters." He inquired into O'Sullivan's pension status and noted that O'Sullivan worked for the County for 23 years. The trial judge then stated that "maybe they should have demoted him, or maybe they should have started him on some course of rehabilitation." The reviewing court should not substitute its judgment for that of the County, but should limit its review to a determination of whether the County acted arbitrarily or unreasonably. *Sutton v. Civil Service Comm'n*, 91 Ill. 2d 404 (1982).

Under the County's disciplinary action policy, an employee can be fired if he commits a major cause infraction; if he is guilty of a fourth offense; or if he repeated similar infractions for which there has been progressive discipline. O'Sullivan contends that because neither sexual nor racial harassment is listed as a major cause infraction, and because during the 23 years preceding his suspension he never received any reprimands, progressive discipline was required. However, although the County does favor progressive discipline, the County recognizes that progressive discipline is not always feasible. Discipline may begin at discharge level in the case of a major cause violation. The County's rules provide that employee abuse is a major cause violation.

It is not unreasonable to read the prohibition against "employee abuse" to encompass sexual and racial harassment of employees. O'Sullivan argues, however, that an interpretation of the County's rules which includes sexual harassment as a major cause violation renders the sexual harassment policies of the County meaningless and defeats their purpose. We disagree. The sexual harassment policy of the Hospital clearly states that anyone found to be in violation of the policy will be subject to disciplinary action ranging from verbal and written warnings to suspension, demotion or discharge. Likewise, executive order 91—4 provides that anyone found to have violated the order shall be subject to employment sanctions, including discharge.

Nevertheless, O'Sullivan contends that under the County's own rules, he should have received a written or verbal reprimand and, further, that he was entitled to the opportunity to be counseled and to change his conduct. The County, however, found that discharge was an appropriate sanction and we agree. The County noted that because O'Sullivan was a department head, he was aware of the County's expectations with respect to discrimination, harassment, or any form of misconduct. The County also noted there was no indication of regret on the part of O'Sullivan or that he would change his behavior if reinstated. The County also found that the complainants' testimony was credible and that their demeanor and attitude revealed that they

14

were adversely affected by O'Sullivan's behavior. The County's decision to discharge was not arbitrary, unreasonable or unrelated to the requirements of service; therefore, we defer to the County's conclusion that the circumstances in this case warranted discharge.

Since we affirm the County's imposition of the sanction of discharge, we need not address O'Sullivan's contention that he is entitled to back pay or related benefits from the date of suspension.

For the aforementioned reasons, we hereby reverse the order of the circuit court of Cook County remanding the case to the County for imposition of a sanction less than discharge. We likewise reverse the order of the circuit court of Cook County affirming the sanction of demotion. We remand the cause to the circuit court of Cook County with instructions to enter an order reinstating the penalty of discharge against O'Sullivan and dismissing O'Sullivan's cross-appeal.

Reversed and remanded with instructions.

CAMPBELL, P.J., and O'BRIEN, J., concur.