**Arthur Garcia SANCHEZ, Appellant,**

v.

**The STATE of Texas.**

**No. 1259–98.**

Court of Criminal Appeals of Texas.

June 30, 1999.

Stephanie L. Stevens, Mark Stevens, San Antonio, for appellant.

Daniel Thornberry, Asst. Dist. Atty., San Antonio, Matthew Paul, State's Atty., Austin, for State.

## *O P I N I O N*

KELLER, J. delivered the opinion of the Court in which McCORMICK, P.J., and MEYERS, MANSFIELD, PRICE, HOLLAND, JOHNSON and KEASLER, JJ., joined.

Appellant was convicted under the "sexual harassment" provision of the official oppression statute. *See* TEX. PEN. CODE § 39.03(a)(3).[1] Relying in large part upon *Long v. State*, 931 S.W.2d 285 (Tex.Crim.App.1996), he argued to the Court of Appeals that this provision is unconstitutionally vague on its face and as applied to his conduct. The Court of Ap-

---

1. All references to sections or subsections are to the Texas Penal Code in effect at the time of the offense unless otherwise specified.

peals sustained these contentions, finding that the sexual harassment provision is (1) unconstitutionally vague on its face and as applied in violation of the Due Process Clause of the Fourteenth Amendment and (2) unconstitutionally overbroad in violation of the First Amendment. *Sanchez v. State*, 974 S.W.2d 307 (Tex.App.—San Antonio 1998). As a result, the Court of Appeals ordered the dismissal of the prosecution.[2] We will reverse the Court of Appeals.

## I. THE STATUTE

### A. The statutory language

The "sexual harassment" portion of the official oppression statute provides: "A

2. The Court of Appeals summarized the evidence in this case as follows:

The complainant Gonzalez was hired by the Board of Trustees of the Via Metropolitan Transit in San Antonio as an assistant to the Board in securing federal grant money. She was placed in the Public Affairs Division of Via, with instructions to report to appellant, the Board Chairman. The allegations of the indictment were chiefly supported by Gonzalez's testimony since the matters arose in private conversations. Gonzalez commenced taping her conversations with appellant in December 1994 or January 1995. The tapes do not support the indictment's allegations. Several witnesses heard appellant tell Gonzalez to put on lipstick or makeup. The grand jury testimony by appellant was introduced. He acknowledged that on an occasion he told Gonzalez to put on lipstick because she looked pale.

Gonzalez acknowledged that she had been hired by the Board and could only be fired by the Board, but knew appellant as Chairman, had great influence and that appellant had so informed her. There was testimony that Gonzalez traveled by plane with appellant to a transportation conference in Washington, D.C., in September 1994, going earlier and coming back later than other representatives of Via at the conference. Gonzalez was instructed to attend after-work meetings at the bar at the Mi Tierra Restaurant several nights a week. Other evidence showed that appellant frequently called Gonzalez at her home at night and that there was concern on the part of one Board member about the relationship. Other testimony indicated that appellant prevented Gonzalez from attending some Board meetings and dictated to her which employee or employees with whom she could not have lunch.

There was no question that Gonzalez had demanded, requested, or expressed a desire repeatedly for a raise, an enclosed office, and a private secretary. One Board member testified that before Gonzalez started her $52,000 job, she requested a raise in order to influence the individuals with whom she would come into contact in the course of her employment. The request was denied. When Gonzalez commenced her employment, there was only one enclosed office in the Public Affairs Division which at the time was occupied by appellant. A smaller enclosed office was built for appellant and the larger one was assigned to Tom Campos, a staff member, by the general manager of Via and appellant. The secretary whom Gonzalez shared with others testified that she typed only three letters for Gonzalez in the eight months or so that Gonzalez was employed by Via.

Other evidence indicated that Gonzalez was constantly inquiring about appellant's whereabouts, spent a great deal of time in appellant's office with the door closed, seemed happy and "jolly" around appellant, and fawned over him. She was always offering to take appellant to lunch or to drive him places. Appellant had a disability as a result of having polio when he was a child. Some witnesses testified that Gonzalez followed appellant around the office, even waiting for him outside the men's restroom. On one occasion, appellant was heard to tell Gonzalez that "he didn't need a shadow, that he had two at home, his mother and his dog." Gonzalez was also seen playing "patty-cake" with appellant at the bar at Mi Tierra.

There was evidence of dissension in the office between Gonzalez and other women employees, some of it arising from Gonzalez's insistence that she was another employee's supervisor. Gonzalez was to complete a legislative agenda project for the Board regarding federal grant money. The report was delayed month by month and, when it was tendered to the Board in January 1995, it was found unacceptable. There was evidence that the Board was generally becoming dissatisfied with Gonzalez's work.

Gonzalez terminated her employment on February 15, 1995, and filed a EEOC complaint. Her husband and brother, both lawyers, presented a 1.2 million dollar claim to Via which was refused. A civil suit was filed and the instant criminal indictment came later.

public servant acting under color of his office or employment commits an offense if he ... intentionally subjects another to sexual harassment." § 39.03(a)(3). A detailed listing of categories falling within the classification of "public servant" is found in the definition section of the penal code. § 1.07(41).[3] A public servant acts under color of his office or employment "if he acts or purports to act in an official capacity or takes advantage of such actual or purported capacity." § 39.03(b). "Sexual harassment" is specifically defined as meaning:

> unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature, submission to which is made a term or condition of a person's exercise or enjoyment of any right, privilege, power, or immunity, either explicitly or implicitly.

§ · 39.03(c).

### B. The legislative history

In proposing the sexual harassment provision, the sponsor and supporters related an incident in which a municipal judge purportedly offered to dismiss a woman's traffic tickets in return for sexual favors. *See* H.B.370, Public Hearings, House Criminal Jurisprudence Committee and Subcommittee on Procedural Matters, April 3 (tape 2, side B & tape 3, side A), April 11 (tape 1, side 2), and April 17 (tape 1, side 2), 1989. The woman went to the judge's office to arrange a payment schedule because she did not have enough money to pay the full amount all at once. Charlotte Keel, H.B. 370, Public Hearings, House Criminal Jurisprudence Committee, April 3, 1989, tape 2, side B. The judge offered to take the woman in his truck for a ride and "see what they could work out." *Id.* After consulting law enforcement authorities, the woman went to the judge's office again, this time wearing a hidden microphone. *Id.* The judge told the woman he would take care of her ticket in exchange for oral sex. *Id.* The woman asked if there was anything else she could do, such as maintenance work around the courthouse, but the judge said, "No, I have something else in mind for you." *Id.* The hearings indicated that the municipal judge was originally prosecuted for official oppression, but that indictment was quashed, and the judge pled guilty to a lesser offense. *See hearings cited above.* One of the supporters of the bill contended that a public official should be held to a higher standard of care and subject to higher sanctions than someone "on the street." Daniel Rice, H.B. 370, Public Hearings, House Criminal Jurisprudence Committee, April 3, 1989, tape 2, side B.

Another supporter indicated, in the form of a question, that the proposed law addresses abuse by officials "not under an employment situation, isn't that right?" Richard Avena, House Criminal Jurisprudence Committee, April 3, 1989, tape 3, side A. But subcommittee hearing discussions indicated that the bill would apply to public employment situations. H.B. 370, House Criminal Jurisprudence Committee, Subcommittee on Procedural Matters, April 11, 1989, tape 1, side 2 (references to improper conduct by one's "boss" and to the concern that employees might use the statute to harass their employers).

The subcommittee deleted the phrase "unwelcome sexual advances" from the definition of "sexual harassment" and added "by word or deed," but these changes were later reversed and the original language—determined by the sponsor and the committee to be "far superior" to the subcommittee amendments—was restored. Representative Valigura, House Floor, May 20, 1989. The original language, and that which now appears in the "sexual harassment" definition, follows the language of the following Equal Employment

---

The trial court's jury charge tracked the indictment but submitted each allegation disjunctively, authorizing conviction on any one of the allegations.

*Sanchez,* 974 S.W.2d at 311 n. 6.

**3.** Appellant does not dispute his status as a public servant.

Opportunity Commission (EEOC) regulation:

> Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment.

29 C.F.R. 1604.11(a)(1)(divisions (2) and (3) omitted). Division (1) of 16.04(a) is commonly known as the "quid pro quo" theory of sexual harassment. This regulation is itself an interpretation of the federal employment discrimination statute in Title VII.[4] The only significant difference between the sexual harassment definition in the official oppression statute and the EEOC regulation is the substitution of "exercise or enjoyment of any right, privilege, power or immunity" for "employment." The substituted phrase was apparently borrowed from another provision of the official oppression statute:

> A public servant acting under color of his office or employment commits an offense if he:
>
> . . .
>
> (2) intentionally denies or impedes another in the exercise or enjoyment of any right, privilege, power, or immunity, knowing his conduct is unlawful.

§ 39.03(a)(2).

## II. COURT OF APPEALS' OPINION

The Court of Appeals found that many of the words used in § 39.03(c) "are susceptible to uncertainties of meaning and are inherently vague." *Sanchez*, 974 S.W.2d at 318. The Court of appeals raised questions regarding the following:

(1) the meaning of "advances," "favors," and "other verbal or physical conduct of a sexual nature (for example, is a wink or a smile enough?),

(2) what makes conduct "sexual,"

(3) whether "unwelcome" applies to all conduct proscribed by the statute or only to "advances,"

(4) whose sensitivities are involved and whether the statute imposes a reasonable person standard,

(5) the meaning of "submission,"

(6) what constitutes an implicit term or condition,

(7) whether the rights, privileges, powers, and immunities must exist at the time of the alleged conduct,

(8) whether the statute can be violated by the conditioning of the rights, privileges, powers, or immunities of a person other than the recipient of the alleged conduct,

(9) the scope of a "right" under the statute—whether it may be perfect or imperfect, in personam or in rem, primary or secondary, absolute or qualified, legal or equitable and whether such rights include constitutional rights, natural rights, civil rights, political rights, or personal rights.

*Id.* at 314 (enumeration ours; discussion paraphrased). The Court of Appeals concluded that the statute fails to specify whose sensitivities are affected and fails to impose a reasonable person standard. *Id.* at 318. Although acknowledging that the statute contains the culpable mental state of "intentionally," the Court of Appeals held that the culpable mental state did not alleviate the vagueness of the underlying conduct. *Id.* Finally, the Court of Appeals held that it could not employ a narrowing construction because doing so would significantly alter the meaning of the statute. *Id.* at 319.

As an alternative basis for its holding, the Court of Appeals contended that the provision is unconstitutionally overbroad under the First Amendment. *Id.* at 320–

---

4. The federal employment discrimination statute provides in relevant part:

> It shall be unlawful employment practice for an employer-
>
> 1) to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, term, conditions, or privileges of employment, because of such individual's race, color, religion, *sex*, or national origin. . . .

42 U.S.C. § 2000e–2(a)(1)(emphasis added).

321. In arriving at this alternative holding, the Court of Appeals said that the statute "deals with speech and expressive conduct" and that the "statute is not narrowly tailored to prohibit only ... unprotected speech." *Id.* at 321 (ellipsis inserted).

## III. ANALYSIS

### A. General principles

■ In construing whether a law is vague and/or overbroad, we keep in mind the elementary principle of statutory construction: we interpret a statute in accordance with the plain meaning of its language unless the language is ambiguous or the plain meaning leads to absurd results. *Boykin v. State,* 818 S.W.2d 782, 785–786 & 786 n. 4 (Tex.Crim.App.1991). In determining plain meaning, "[w]ords and phrases shall be read in context and construed according to the rules of grammar and usage." TEX. GOV'T CODE § 311.011(a); *Dowthitt v. State,* 931 S.W.2d 244, 258 (Tex.Crim.App.1996). In the event that we find resorting to extratextual sources to be necessary under *Boykin,* these sources include but are not necessarily limited to: (1) circumstances under which the statute was enacted, (2) legislative history, (3) common law or former statutory provisions, (4) consequences of a particular construction, and (5) title (caption), preamble and emergency provision. TEX. GOV'T CODE § 311.023, made applicable to Penal Code by TEX. PEN. CODE § 1.05(b). We may also look to other offense provisions contained in the same statutory section. *Long,* 931 S.W.2d at 291 (comparing stalking provision to other provisions contained in § 42.07).

■ In addressing the Court of Appeals' holdings, we address the First Amendment's applicability before addressing the Court of Appeals' vagueness holding—not only because of the Court of Appeals' alternative holding regarding overbreadth, but also because the First Amendment's applicability "change[s] the character of the vagueness question." *Long,* 931 S.W.2d at 295. Due Process vagueness standards are less exacting than those dictated by the First Amendment. *Id.* at 287–288 (Citing *Kramer v. Price,* 712 F.2d 174 (5th Cir.), *rehearing en banc granted,* 716 F.2d 284 (5th Cir.), *grant of relief affirmed,* 723 F.2d 1164 (5th Cir.1984)). And, under the First Amendment, a statute may be subject to a facial challenge even though it may have some legitimate application, but absent the First Amendment, "a facial challenge could be mounted successfully only if the statute were vague in all of its applications." *Long,* 931 S.W.2d at 295 (citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494–495, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982). To be vague in all of its applications, a statute must necessarily be vague as to the litigant; hence, if the statute is not vague as to the litigant, a Due Process challenge must necessarily fail: a person "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Village of Hoffman Estates,* 455 U.S. at 495, 102 S.Ct. 1186.

### B. Statutory construction

#### 1. *"Unwelcome"*

■ Some of the Court of Appeals' questions can be answered by simple statutory construction, without resort to constitutional analysis. We begin with the application of the word "unwelcome." The text "unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature," contained in the sexual harassment definition of the Texas statute, is ambiguous concerning what part of that list is modified by "unwelcome." As the Court of Appeals observed, the language produces two possible interpretations: (1) "unwelcome" modifies only "sexual advances," or (2) "unwelcome" modifies the entire list (i.e. "unwelcome" also modifies "requests for sexual favors" and "other verbal or physical conduct of a sexual nature"). Under the former interpretation, the statute would cover situa-

tions in which sexual conduct was welcomed by the recipient as part of a corrupt sex-for-benefits trade. The recipient, rather than being a victim of unwanted conduct, would be an accomplice to a form of bribery or prostitution. Under the latter interpretation, however, the statute would cover only situations in which the recipient was a victim of undesired conduct.

The latter interpretation does create an awkward construction. In essence, that interpretation would read the statute as proscribing "unwelcome sexual advances, unwelcome requests for sexual favors, and unwelcome other verbal or physical conduct of a sexual nature." In *State v. Edmond*, 933 S.W.2d 120 (Tex.Crim.App. 1996), we discussed the parties arguments regarding whether an indictment for official oppression must define "unwelcome sexual advances" and "requests for sexual favors." *Id.* at 122, 127, & 128. The grouping of the terms in that discussion would imply that "unwelcome" relates only to "sexual advances." However, although we employed the parties' terminology in discussing the point of error involved, we did not endorse that grouping of terms. *See id., passim.* And while the grammatical construction for the latter interpretation is awkward, that construction is not definitively incorrect. As the sexual harassment definition's language is ambiguous, we resort to sources outside the language of that definition.

The committee meetings are rather unhelpful. The subcommittee members deletion of "unwelcome sexual advances" in their proposed amendment may have been an indication that they believed that "unwelcome" modified only "sexual advances"

rather than the entire list. But the subcommittee's amendment was rejected in favor of the original language. We find, however, that other sources present persuasive reasons for finding that "unwelcome" does indeed modify the entire list.

Because the portion of the Texas sexual harassment definition at issue is taken verbatim from an EEOC regulation, federal interpretation of that regulation is relevant to interpreting the Texas provision. At the time the Texas statute was passed, the Supreme Court had already interpreted "unwelcome" as applying to the entire list of sexually harassing conduct found in the EEOC regulation: "The gravamen of any sexual harassment claim is that the alleged sexual advances are 'unwelcome.' 29 C.F.R. § 1604.11(a)(1985)." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 68, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)(discussing harassment claims in general and holding that "voluntariness" of participation in sexual conduct was irrelevant so long as the conduct was "unwelcome").

Moreover, the title of the Texas statute, "Official *Oppression,*" indicates that the recipient is the victim of unwelcome conduct, not a coconspirator forming a corrupt bargain. Had the statute been intended to cover an entirely consensual, but corrupt, sex-for-benefits bargain, the title would more appropriately label the statute as "Official Corruption" or "Official Misconduct." In addition, the term "sexual *harassment*" connotes conduct undesired by the recipient. The term "sexual misconduct" would be a more appropriate description of conduct welcomed by the recipient in a corrupt bargain.[5] Finally, the other offenses contained in § 39.03—subsections (a)(1) and (a)(2)—involve conduct

---

**5.** And though willing sexual conduct would, therefore, not violate § 39.03, such conduct might be proscribed by statutes relating to prostitution or bribery. The prostitution statute provides:

A person commits an offense if he knowingly:
(1) offers to engage, agrees to engage, or engages in sexual conduct for a fee; or (2) solicits another in a public place to engage with him in sexual conduct for hire.

§ 43.02(a). The bribery statute provides in relevant part:

A person commits an offense if he intentionally or knowingly offers, confers, or agrees to confer on another ... any benefit [e.g. sex] as consideration for the recipient's ... exercise of discretion as a public servant.

§ 36.02(a)(1)(ellipsis and bracketed material added).

that is necessarily not welcomed by the recipient.[6] Accordingly, we hold that all forms of sexual harassment under the Texas provision must involve "unwelcome" conduct.

### 2. *"Intentionally"*

■ We agree with the Court of Appeals that the statute does not impose a reasonable person requirement. Had the Legislature intended that a reasonable person requirement apply, it could easily have specified one, and it did not. *See Long*, 931 S.W.2d at 290. However, we disagree with the Court of Appeals' conclusion that the statute fails to specify whose sensitivities are affected. The statute specifies *both* the perpetrator's and the victim's sensitivities. The phrase "intentionally subjects another to sexual harassment" indicates that (1) someone is subjected to sexual harassment, i.e. the victim's sensitivities are affected, and (2) the perpetrator intends that someone be subjected to sexual harassment, i.e. the perpetrator's own sensitivities are involved.

■ Moreover, the statute requires intent on the part of the perpetrator that the conduct be of a sexual nature, not merely that the recipient perceive the conduct as sexual. To intentionally subject someone to a sexual advance, for example, the actor must be *intending* a *sexual* advance. To use the Court of Appeals' examples, a wink or a smile would not fall within the statute unless the perpetrator *intended* the wink or smile *to be* a sexual advance (or a request for sexual favors, or other verbal or physical conduct of a sexual nature). Moreover, because the statute requires that the perpetrator intentionally subjects the victim to "unwelcome" sexual conduct, the perpetrator must necessarily be aware that the sexual conduct is in fact unwelcome to be liable under the statute.[7]

**6.** § 39.03(a)(1) provides: "A public servant acting under color of his office or employment commits an offense if he ... intentionally subjects another to mistreatment or to arrest, detention, search, seizure, dispossession, assessment, or lien that he knows is unlawful." For text of subsection (a)(2), see this opinion, *ante*.

**7.** Given the structure of the statute and its apparent purposes, we find that the statute does not require the perpetrator to intend that the conduct be unwelcome. He may in fact wish that the conduct were welcomed by the recipient, but he intentionally subjects the recipient to unwelcome sexual conduct when he intends sexual conduct that he knows is unwelcome. This is so because the sexual nature of the conduct flows from the actor, but the unwelcome nature of the conduct flows from the recipient. Despite the fact that unwelcome describes a recipient's state of mind, the statute uses "unwelcome" as an adjective to describe the nature of the conduct. Hence, the perpetrator intends conduct which is unwelcome, but he does not necessarily intend the conduct to be unwelcome.

In his concurring opinion, Judge Womack contends that the structure of the statute supports the conclusion that the actor must intend the unwelcomeness of the conduct because other provisions in the official oppression statute specify both intentional and knowing mental states. While these other provisions offer some support for Judge Womack's contention, the placement of "unwelcome" in the particular grammatical construction in which it is found in the sexual harassment provision lends support for our interpretation of the statute, as explained above. Moreover, because the portion of the statute containing the word "unwelcome" was borrowed verbatim from the EEOC regulation concerning sexual harassment, the variance in language from the other provisions of the official oppression statute is not so significant.

However, even if the plain language did call for the conclusion that Judge Womack advocates, that conclusion would lead to absurd results. A statute that covered only conduct that an actor intended to be unwelcome—i.e., where the actor harbored the conscious objective or desire for the conduct to be unwelcome—would cover few instances of sexual coercion by a public servant in the *quid pro quo* context. That interpretation would seem to require something in the nature of sadistic intent. Given that the Legislature borrowed the language of the statute from the EEOC regulation involving sexual harassment, such a limited view of the sexual harassment provision is manifestly unreasonable. Moreover, the incident which incited this leglislation—the request for sexual favors by a municipal judge in exchange for dismissing a traffic ticket—appears unlikely to fall within a defi-

Further, by making "sexual harassment" the object of "intentionally subjects" and then defining sexual harassment separately, the statute makes clear that the perpetrator's intent relates to the entire definition of sexual harassment. The statute requires that the perpetrator not only intentionally subject a victim to the specified unwelcome sexual conduct (sexual advances, request for sexual favors, etc.), the perpetrator must also intend that submission to the conduct is made a term or condition of a person's exercise of any right, privilege, power, or immunity. In other words, the culpable mental state applies to both (1) the sexual conduct, and (2) the *quid pro quo.*

### 3. *"rights, privileges, powers, and immunities "*

■ For the purpose of this opinion, we will assume, but do not decide, that the phrase "rights, privileges, powers, and immunities" is so broad that it covers anything of value to a person. Nevertheless, we find that employment in the public sector clearly falls within the meaning of "privilege." The word privilege has been used to mean numerous things, including evidentiary privileges (e.g. the attorney-client privilege) and constitutional rights (e.g. the privilege against self-incrimination). However, the above examples are clearly not what the Legislature means because "rights" are already enumerated in the statute along with privileges. Black's Law Dictionary lists numerous definitions of "privilege" but the one that seems most appropriate is the first one: "A particular and peculiar benefit or advantage enjoyed by a person, company, or class beyond the common advantages of other citizens." BLACK'S LAW DICTIONARY, 6th ed., 1197 (1990). In discussing "privileges of employment" under the Title

VII, the Supreme Court indicated that a "privilege" is a benefit that an entity is under no obligation to furnish. *Hishon v. King & Spalding,* 467 U.S. 69, 75, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). Public employment is, of course, a benefit that the government is not obligated to furnish, and it is a benefit enjoyed by some persons but not by others. Public employment has been characterized by courts as a privilege, and the Supreme Court, while denouncing the idea that constitutional protections turn upon whether a governmental benefit is characterized as a "right" or "privilege," has indicated that public employment is at least a privilege. *See Elrod v. Burns,* 427 U.S. 347, 361 & 361 n. 15, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

And while the event that apparently led to the sexual harassment legislation was an incident between a public official and a private citizen, the language of the statute does not exclude public employment from its scope.[8] In fact, we have previously held that another provision of the official oppression statute applies to an official's interactions with employees in the course of employment. *Bryson v. State,* 807 S.W.2d 742, 745–746 (Tex.Crim.App.1991) (construing the phrase "intentionally subjects another to mistreatment" in § 39.03(a)(1)).

### 4. *"a person's exercise or enjoyment"*

■ As the Court of Appeals suggested, the language of the statute does not limit the *quid pro quo* to the *recipient's* exercise or enjoyment of rights, privileges, powers, and immunities. Under the language, an official could make sexual advances upon the recipient submission to which would be a term or condition of a *third party's* exercise or enjoyment of a right, privilege,

nition of sexual harassment that requires the actor to intend the unwelcomeness of the conduct.

8. Richard Avena's remark during the committee hearings could be interpreted as evidencing an intent for the statute to apply only outside the employment context. However,

this remark is weak evidence as it was an isolated comment and took the form of a question. Moreover, the speaker could merely have been referring to the fact that the statute's reach extended to conduct outside of the employment context. And subcommittee discussions referred to the employment context.

power or immunity. For example, an official could request sexual favors from an individual in exchange for arranging a relative's parole from prison. Such a scenario appears to be contemplated by the statute.

## B. First Amendment

■■■■ Where First Amendment freedoms are implicated, the law must be sufficiently definite to avoid chilling protected expression. *Long,* 931 S.W.2d at 287 (citing *Grayned v. Rockford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222(1972)). The question in the present case is whether the sexual harassment provision reaches protected expression. We have never had occasion to rule upon the constitutionality of the sexual harassment provision, and our research has uncovered few appellate cases from other jurisdictions addressing whether sexual harassment laws violate the First Amendment. Most appellate cases have found no First Amendment violation. *Baty v. Willamette Industries, Inc.,* 172 F.3d 1232, 1246–47 (10th Cir.1999)(upholding Title VII); *United States v. Swan,* 48 M.J. 551, 556 (N.M.Ct.Crim.App.1998)(upholding military regulation);[9] *Trayling v. Board of Fire and Police Com'rs,* 273 Ill.App.3d 1, 209 Ill.Dec. 846, 652 N.E.2d 386, 395 (2 Dist.1995)(Illinois statute modeled after Title VII). We have found one appellate case in which a sexual harassment provision was found to be unconstitutional, based upon First Amendment considerations, as applied to a particular defendant. *Cohen v. San Bernardino Valley College,* 92 F.3d 968, 971–972 (9th Cir.1996)(public community college's sexual harassment policy), *cert. denied sub. nom., Beeman v. Cohen,* 520 U.S. 1140, 117 S.Ct. 1290, 137 L.Ed.2d 364 (1997).

The Supreme Court has indicated that Title VII does not infringe upon protected expression. *Wisconsin v. Mitchell,* 508 U.S. 476, 487, 113 S.Ct. 2194, 124 L.Ed.2d 436 (citing *Hishon v. King & Spalding,* 467 U.S. 69, 78, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) and *R.A.V. v. St. Paul,* 505 U.S. 377, 389–390, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992)); *see also Baty,* at 1246–47. The Court characterized Title VII as a valid "content-neutral regulation of conduct." *Mitchell,* 508 U.S. at 487, 113 S.Ct. 2194. However, the Court of Appeals correctly observed that the sexual harassment provision of the official oppression statute is only partially modeled upon the EEOC regulation for sexual harassment under the federal antidiscrimination law. The question remains whether the differences between the federal regulation and the Texas provision requires a different outcome under the First Amendment.

■■■■ Whatever the scope of "rights, privileges, powers, and immunities," the sexual harassment provision of the official oppression statute proscribes conduct that, at least, contains the following elements:

(1) an official's use of his official position,

(2) to intentionally engage in conduct of a sexual nature or attempt to procure sexual favors,

(3) which he knows is not welcomed by the recipient,

(4) intending submission to which to be a term or condition of the recipient's or another person's enjoyment of something of value to that person.

The offense proscribed is in many ways similar to bribery or extortion. Under the common law, extortion by public officials was essentially a form of bribery: the official took money that was not due him for the performance of official duties. *Evans v. United States,* 504 U.S. 255, 260, 112 S.Ct. 1881, 119 L.Ed.2d 57 (1992). Congress incorporated this common law definition into its Hobbs Act statute. *Id.* at 263–264, 112 S.Ct. 1881. Congress also provided for an offense of extortion involving private individuals in which property is taken by means of force, fear, or threats. *Id.* at 261.

---

**9.** We recognize that the military court's opinion's persuasive value is limited due to the unique circumstances surrounding military service. *Swan,* 48 M.J. at 555.

Bribery and extortion, while involving "speech," are not protected by the First Amendment. "Threats and bribes are not protected simply because they are written or spoken; extortion is a crime although it is verbal." *United States v. Marchetti,* 466 F.2d 1309, 1314 (4th Cir.), *cert. denied,* 409 U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972). "It may categorically be stated that extortionate speech has no more constitutional protection than that uttered by a robber while ordering his victim to hand over the money, which is no protection at all." *United States v. Quinn,* 514 F.2d 1250, 1268 (5th Cir.1975), *cert. denied,* 424 U.S. 955, 96 S.Ct. 1430, 47 L.Ed.2d 361 (1976). *See also United States v. Hutson,* 843 F.2d 1232, 1235 (9th Cir.1988).

 As with official extortion—what we would now call bribery—the sexual harassment provision is concerned with the use of official power to obtain a benefit to which the official was not otherwise entitled. In a bribery/official extortion case, that benefit was traditionally money or tangible property, but the receipt of someone's submission to sexual conduct seems to be as legitimate an object of government regulation. The First Amendment does not give an official the right to trade official services for sexual favors or for submission to conduct of a sexual nature.

 Further, as discussed above, the sexual harassment statute goes beyond mere bribery due to the requirement that the conduct be "unwelcome." With that requirement, the sexual harassment provision encompasses coercive conduct—analogous to private extortion. Sexual harassment under the statute is essentially sexual extortion: an official uses his official position to coerce submission to conduct of a sexual nature. And the statute criminalizes sexual harassment that is *intentional.* To be liable, the official must intend the sexual nature of his conduct, he must be aware that the conduct is unwelcome, and he must intend submission to the conduct to be made a term or condition of enjoying something of value to the recipient or another person—something of value that the official is in a position to withhold or provide. In other words, the official must intend to carry out sexual extortion. The First Amendment is not implicated by such activity.

Although the Court of Appeals relies heavily upon our previous opinion in *Long,* that case is distinguishable. The relevant provision of the stalking law, which we labeled "the conduct requirement," proscribed conduct "directed specifically toward the other person ... that is reasonably likely to harass, annoy, alarm, abuse, torment, or embarrass that person." *Long,* 931 S.W.2d at 288 (ellipsis inserted) (quoting former § 42.07(a)(7)(A)(1993)).[10] The conduct requirement was accompanied by a culpable mental state of intent. *Id.* However, "conduct does not lose First Amendment protection merely because the actor intends to annoy the recipient." *Id.* at 293. The same can be said of an actor's intent to harass, alarm, abuse, torment, or embarrass. *Id.* at 296. But the sexual harassment provision contains at least three narrowing elements not found in the stalking provision: (1) that the perpetrator be a public servant acting under color of his office or employment, (2) that the perpetrator intentionally engage in conduct of a *sexual* nature (versus *any* conduct in the stalking provision), and (3) that the perpetrator intentionally impose a *quid pro quo.* With these narrowing elements, the sexual harassment provision

---

10. Although the stalking law also contained a "threat" requirement, the threat was required for only one of two predicate acts under the statute. *Id.* at 288 & 291. Because the stalking statute provided for no nexus between the two predicate acts and because the general "conduct requirement" could by itself distinguish the stalking offense from a lesser included offense that penalized threats, we held that the "conduct requirement" had to pass muster on its own, apart from the "threat requirement." *Id.* at 291–294. The sexual harassment provision, on the other hand, does not split the elements of the crime among different predicate acts.

targets conduct that is far more specific and far less innocent than the stalking provision's proscription against intentionally annoying, harassing, alarming, abusing, tormenting, or embarrassing conduct.

Although we are not bound by federal intermediate appellate opinions, we also find the Ninth Circuit's *Cohen* case distinguishable. In finding a First Amendment violation, the *Cohen* court found that the College had applied the "nebulous outer reaches" of its sexual harassment policy to a professor's longstanding teaching methods. 92 F.3d at 972. The policy at issue in *Cohen* encompassed a "hostile learning environment" theory:

> Sexual harassment is defined as unwelcome sexual advances, requests for sexual favors, and other verbal, written, or physical conduct of a sexual nature. It includes, *but is not limited to,* circumstances in which:
>
> . . .
>
> Such conduct has the purpose *or effect* of unreasonably interfering with an individual's academic performance or creating an intimidating, hostile, or offensive learning environment.

92 F.3d at 971 (emphasis added; ellipsis inserted). This "hostile learning environment" theory appears to be borrowed from the "hostile work environment theory" found in the EEOC regulations. *See* 29. C.F.R. 1604.11(a)(3). As can be seen from the language, the hostile environment theory is much broader than a *quid pro quo* theory. The sexual harassment policy in *Cohen* lacks both the culpable mental state and the *quid pro quo* elements found in the Texas provision. Under the policy in *Cohen,* a wink or a smile could in fact have been considered sexually harassing conduct even if the actor did not harbor a sexual purpose. Moreover, the policy's proscription against an "offensive learning environment" was much like the stalking law's open ended proscription against annoying conduct. Further, the policy in *Cohen* even included a clause that sexual

harassment is not limited to the kinds of acts specifically proscribed. The Texas sexual harassment provision is quite unlike the open-ended policy addressed in *Cohen.*

### C. Due Process

▇▇ Absent First Amendment considerations, the Due Process Clause requires that a law be specific enough to: (1) give a person of ordinary intelligence a reasonable opportunity to know what is prohibited, and (2) establish determinate guidelines for law enforcement. *Long,* 931 S.W.2d at 287. As we have stated above, when protected expression is not at issue, the defendant must show that the law is vague as applied to him (or vague in all of its possible applications).

▇▇▇ We find that the phrase "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature" is a reasonably specific phrase for Due Process purposes primarily because that phrase is modified by the culpable mental state of "intentionally." Because the perpetrator must intend the sexual nature of his conduct and must know that the conduct is unwelcome to trigger a violation of the statute, the unwelcome sexual conduct phrase reasonably informs ordinary citizens of the conduct proscribed and provides adequate guidelines for enforcement. As for the phrase "right, privilege, power, and immunity," we need not decide whether that phrase may in some instance deprive a person of fair notice of the conduct proscribed. As the statutory construction portion of this opinion shows, public sector employment clearly falls within the term "privilege," and hence, the statute clearly proscribes a public servant's attempt to condition a subordinate's continued employment or benefits associated with employment on submission to sexual behavior. Such employment-related conduct comprises the situation in the present case. Therefore, appellant cannot prevail on his vagueness claim purely on Due Process grounds.[11] We find the sexual harassment

11. We express no opinion concerning wheth-

er some or all of the allegations in the indict-

provision to be constitutional on its face and as applied to appellant.

The judgment of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.

MANSFIELD, J., filed a concurring opinion.

PRICE, J., filed a concurring opinion.

WOMACK, J., filed a concurring opinion.

MANSFIELD, J., delivered a concurring opinion.

I join the opinion of the majority but write further for two reasons:

(1) To provide a more detailed description as to the events that gave rise to this cause; and

(2) To try to clarify the difference between "sexual harassment" that is in bad taste, poor manners or otherwise might be that basis of civil liability and "sexual harassment" that may subject the actor to potential criminal liability under Texas Penal Code § 39.03.[1]

Appellant, during the period of time in which the events resulting in the charge against him took place, was chairman of the Board of VIA, the public transportation system for the City of San Antonio. Complainant was employed by the Board as an assistant for governmental affairs. As such, complainant reported to appellant as her de facto supervisor.

At trial, the complainant testified appellant began making sexual advances toward her.[2] These advances began in June of 1994. During August of 1994, according to the complainant, appellant's behavior escalated into requests for sex (complainant was married at the time, a fact known to appellant), or an affair, and threats that should she not comply she could lose her job. She declined his advances. Appellant told her he had had an affair with her predecessor and she had to do likewise. The complainant testified appellant repeated his demand that they have an affair during a business trip to Washington, D.C. in September of 1994. When she declined his advances again, complainant testified appellant gave another employee of VIA the larger office that had been promised to her by appellant.

During October of 1994, complainant testified, she spoke to a coworker, Zamora, about the situation and thereafter appellant's sexual advances stopped for awhile. She also spoke with VIA's in-house EEOC person, who, she testified, was not helpful and told her, in effect, appellant was very powerful. Complainant subsequently testified appellant's advances became more frequent and more intense in December of 1994. On several occasions he told her she would be fired if she refused to have sex with him, and he would touch her on various parts of her body. He also belittled her marital status, talked about her legs, and, on one occasion, said a bruise on her leg was a result of rough sex. Complainant testified she continually told him to leave her alone; his response was, essentially, he was the chairman, had lots of power, and could do whatever he wanted.

During January of 1995, complainant told Zamora about appellant's latest advances; Zamora told complainant she should get appellant's advances on tape

---

ment contain all of the elements required by the sexual harassment provision as we have construed it. The Court of Appeals may address such issues on remand, if those issues are found to be properly before the court.

1. Texas Penal Code, § 39.03(a)(3) provides that a person commits the offense of official oppression if he "intentionally subjects another to sexual harassment." Section 39.03(c) defines sexual harassment as "unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature, submission to which is made a term or condition of a person's exercise or enjoyment of any right, privilege, power or immunity, either explicitly or implicitly." Official oppression is a Class A misdemeanor.

2. Complainant's testimony consists of over 100 pages of the trial record. The first sexual advances occurred on a business trip to Port Aransas.

but, other than that, given appellant's power, there was not much she could do about it.[3]

During February of 1995, complainant filed complaints with the EEOC. On March 10, 1995, complainant give a written statement to a San Antonio Police detective concerning this matter, describing the events that gave rise to the charge filed against appellant.

Texas Penal Code § 6.02 states that a person does not commit an offense unless he intentionally, knowingly, recklessly, or with criminal negligence engages in conduct delineated in the definition of the offense. The only way that a definition of an offense may dispense with the requirement of a culpable mental state is if that definition plainly dispenses with any mental element. Tex. Penal Code, § 6.02(b). Section 39.03(a)(3) clearly describes the mental state necessary for an individual to commit the offense of official oppression by sexual harassment: the actor must *intentionally* subject another to "sexual harassment." Furthermore, "sexual harassment" is carefully and specifically defined in § 39.03(c) as "unwelcome sexual advances. . . ."

Appellant's conduct in the present case was blatantly intentional: testimony established he continually made advances toward the complainant despite her repeated pleas for him to stop. Such behavior is commonly referred to as "quid pro quo" sexual harassment, i.e., the harasser tells the harassee that failure to submit will result in adverse employment-related consequences for the harassee. See *Henson v. City of Dundee,* 682 F.2d 897 (11th Cir.1982); *Burlington Industries v. Ellerth,* 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998). Complainant sustained adverse job-related consequences due to her refusal to submit, namely, the loss of a raise, a bigger office and secretarial assistance. She also was threatened with the loss of her job itself. There is little doubt that such quid pro quo sexual harassment suffered by complaint might well give rise to redress under civil law.[4] Section 39.03 criminalizes only quid pro quo sexual harassment that is "intentional."

A statute will survive attack as being unconstitutionally vague provided it gives fair warning to the defendant as to what conduct it proscribes. *New York v. Ferber,* 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982). Section 39.03 is not unconstitutionally vague, especially as applied to appellant. Section 39.03 criminalizes *only intentional* sexual harassment. Furthermore, the intentional sexual harassment *must have the added component* of a threat of loss of job-related rights (or other protected rights) made by the harasser and directed at the harassee. For there to be a conviction under § 39.03, the State must prove the defendant's actions were intentional *and* that the victim was threatened with the loss of a protected right or privilege should she not submit to the defendant's demands.

Testimony at trial established the required culpable mental state: appellant intentionally persisted in making unwelcome sexual advances despite complainant's requests that he cease doing so. Testimony at trial also established appellant told complainant that failure to comply with his demands would result in loss of her job (she did lose a promised raise and other job-related benefits), which meets the requirement of § 39.03(c) that the sexual harassment involve a threat to a valuable right or privilege of the victim (such as a job) should she not submit.

Certainly, § 39.03(c) does not criminalize protected speech, such as asking a

---

**3.** Other testimony established complainant never received a promised raise, secretarial support or more office space.

**4.** The other major category of sexual harassment is so-called "hostile work environment" sexual harassment. Examples of hostile work environment sexual harassment might include leaving sexually-suggestive materials around the workplace, making comments on fellow employees' appearance and/or dress, etc. It does not involve any threats of loss of employment or other rights or privileges.

coworker out for a date, making a comment about someone's dress or even what might amount to hostile work environment sexual harassment. In effect, all § 39.03(c) does is criminalize what is intentional sexual harassment coupled with extortion: either do what I want or else something bad will happen to you. It is difficult to see how this statute is either vague or runs afoul of the First Amendment, given how narrowly-drafted it really is.

With these comments, I join the opinion of the Court.

PRICE, J., delivered a concurring opinion.

I join the opinion of the majority and write separately in response to the conflicting views of what culpable mental state is required regarding the "unwelcomeness" of the conduct. *Ante* at 685 n. 7; *post* at 692 (Womack, J., concurring).

I disagree with the majority's assertion that the incident which incited this legislation appears unlikely to fall within the definition of sexual harassment that requires the actor to intend the unwelcomeness of the conduct. As the majority explains, that case involved a judge telling a woman he would take care of her ticket in exchange for oral sex. When asked by the woman if she could do anything else, such as maintenance work around the courthouse, the judge responded "No, I have something else in mind for you." This colloquy could easily be interpreted as a

sexual predator continuing his unwelcome advances, not only knowing they were unwelcome, but intending them to be unwelcome as a further display of his power and authority over the woman. Thus, I believe the case which incited this legislation, as well as the instant case, could be considered sexual harassment under either the majority's interpretation or Judge Womack's concurring opinion.

With these comments, I join the opinion of the Court.

WOMACK, J., filed a concurring opinion.

I do not join footnote 7 of the Court's opinion, in which it is said that Penal Code § 39.03(a)(3) "does not require the perpetrator to intend that the conduct be unwelcome," but only that "he intends sexual conduct that he knows is unwelcome." The Court "finds" this to be so, "[g]iven the structure of the statute and its apparent purposes."

The structure of the statute supports an opposite conclusion. Subsection (a)(1) has two culpable mental states; it is an offense for a certain person "intentionally" to subject another to conduct "that he knows is unlawful."[1] Subsection (a)(2) has two culpable mental states; it makes it an offense for a certain person "intentionally" to engage in certain conduct "knowing his conduct is unlawful."[2] Subsection (a)(3) has one culpable mental state: "intentionally." It never uses the word "knowing," nor does subsection (c).[3] If the legislature

---

1. "(a) A public servant acting under color of his office or employment commits an offense if he:

"(1) intentionally subjects another to mistreatment or to arrest, detention, search, seizure, dispossession, assessment, or lien that he knows is unlawful." Tex. Penal Code § 39.03(a)(1).

2. "(a) A public servant acting under color of his office or employment commits an offense if he:

"(2) intentionally denies or impedes another in the exercise or enjoyment of any right, privilege, power, or immunity, know-

ing his conduct is unlawful" *Id.*, § 39.03(a)(2).

3. "(a) A public servant acting under color of his office or employment commits an offense if he:

"(3) intentionally subjects another to sexual harassment." *Id.*, § 39.03(a)(2).

"(c) In this section, 'sexual harassment' means unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature, submission to which is made a term or condition of a person's exercise or enjoyment of any right, privilege, power, or immunity, either explicitly or implicitly." *Id.*, § 39.03(c).

wanted to make it an offense to intentionally engage in conduct that the actor knew was unwelcome, it conspicuously failed to do in subsections (a)(3) and (c) what it naturally and clearly did in subsections (a)(1) and (2).

As to the purpose of the statute, the Court assures us that "the perpetrator ... may in fact wish that the conduct were welcomed by the recipient." I shall not question the Court's knowledge that there are such persons. I shall not deny that it would have been a fine thing for the legislature and the governor to have made the conduct of such persons an offense; it may be that a statute that did so would have been better than the one we have. But it is really unacceptable for the Court to hold that, if the statute means what it says, it would cause "absurd results" because it "would cover few instances of sexual coercion"—only those that are committed with "something in the nature of sadistic intent." [4] The holding begs the question; the Court can say that an instance of unintentional sexual conduct is "coercion" only by assuming that the legislature wanted to define that instance as coercion, which is assuming the point that is at issue. Worse, it is self-contradictory; the Court cannot say in one breath that a statute can be construed in a reasonable fashion, namely to reach sadistic, intentional conduct, and in the next breath that that construction leads to absurd results. The statute might not cover conduct as the Court wants, but that is not the same as its being absurd. We are not the legislature; we must deal with the statute that the legislature and the governor enacted. And that statute says it is an offense if a certain person "intentionally subjects another to ... unwelcome ... conduct of a sexual nature." I see no room in that language for a culpable mental state other than intent.