Opinion issued January 12, 2006
 
     












In The
Court of Appeals
For The
First District of Texas




NO. 01-04-01147-CR
____________

CHARLIE PLOEGER JR., Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the County Court at Law Number Three
Ford Bend County, Texas
Trial Court Cause No. 98947A




O P I N I O N
          A jury convicted appellant, Charlie Ploeger Jr., of the class A misdemeanor
offense of stalking.


 See Tex. Pen. Code Ann. § 42.072 (Vernon 2003). The trial
court assessed his punishment at 365 days in jail, suspended his sentence, and placed
him on probation (community supervision) for 24 months. We determine (1) whether
the trial court erred in charging the jury on stalking; (2) whether the evidence was
legally sufficient to support the stalking conviction; and (3) whether the stalking
statute is unconstitutional on its face or as applied to appellant. We reverse the
judgment and remand the cause.
Background
          Appellant, who was in his 60s, was a long-time member at the Jehovah’s
Witness Kingdom Hall in Stafford, Texas. The complainant, Sylvia Solis, who was
in her 20s, had later begun attending meetings at the same Kingdom Hall. In March
2001, during a church meeting, appellant passed Solis notes asking her to have lunch
with him; Solis declined by writing “no” upon appellant’s notes and returning them
to him. From that point forward, appellant began sending cards, letters, flowers, and
gifts to Solis, mainly through her mother’s business, and eventually daily. The letters
and cards repeatedly referred to their being married or having children as a future
certainty, despite the fact that Solis had never even spoken to appellant. Solis was
“terrified” and “frightened to death” by appellant’s actions. Appellant also repeatedly
sat near or stared at Solis at church, often drove through the church parking lot even
after the elders there had asked him to leave because of his behavior toward Solis, at
least once waited for her at a nearby parking lot outside the Kingdom Hall property,
once left gifts for her on a friend’s car that looked like hers, and visited her mother’s
store, despite the fact that a police officer and church elder had told appellant either
that Solis was terrified by his actions toward her or that his advances were
unwelcome and should be stopped. Appellant’s actions continued even after he had
been arrested for stalking Solis.
Jury-Charge Error
          In issue four, appellant argues that the trial court erred in instructing the jury
on the law of stalking. Specifically, appellant complains that the application
paragraphs erroneously set out as different acts, each of which could independently
constitute the offense of stalking, what should have been charged as necessary
elements of the single offense of stalking. Appellant argues that these elements
should have been charged conjunctively (as required for all necessary elements of one
offense), rather than disjunctively (as allowed for different acts each of which
constitutes a separate offense). Appellant further reasons that this disjunctive charge
improperly allowed him to be convicted by non-unanimous verdict. The trial court
overruled appellant’s many objections on these grounds.


 The State concedes
reversible error. 
A.      Error
          We agree with both parties that the charge was erroneous and requires reversal.
          We start our analysis with the information, which read in pertinent part:
[Appellant] . . . did then and there on or about March 1, 2001 and
continuing until on or about May 14, 2002, in the County of Fort Bend
and State of Texas, did then and there [sic]: on more than one occasion
and pursuant to a common scheme or course of conduct directed
specifically at Sylvia Solis, knowingly engaged [sic] in conduct that the
defendant believed or should have reasonably believed that Sylvia Solis
would regard as threatening bodily injury or death to Sylvia Solis
namely, by following Sylvia Solis and sending Sylvia Solis mail and
gifts[.]
 
It is further presented that [appellant] . . . heretofore on or about March
1, 2001 and continuing until on or about May 14, 2002, in the County
of Fort Bend and the State of Texas, did then and there: on more than
one occasion and pursuant to a common scheme or course of conduct
directed specifically at Sylvia Solis, knowingly engaged [sic] in conduct
that would cause a reasonable person to fear bodily injury or death to
herself namely, by following Sylvia Solis and sending Sylvia Solis mail
and gifts[.]

          Although the charge’s instructions set out the stalking statute in its entirety, its
application paragraphs tracked the information:
 
III.
Now if you find from the evidence beyond a reasonable doubt that
on or about March 1, 2001 and continuing until on or about May 14,
2002 in Fort Bend County, Texas, [appellant] did then and there, on
more than one occasion and pursuant to a common scheme or course of
conduct directed specifically at Sylvia Solis, knowingly engaged [sic]
in conduct that the defendant believed or should have reasonably
believed that Sylvia Solis would have regarded as threatening bodily
injury or death to Sylvia Solis namely, by following Sylvia Solis or [sic]
sending Sylvia Solis mail or gifts. [sic]
 
Unless you do so find beyond a reasonable doubt, or if you have
a reasonable doubt thereof, you should read forward and consider the
next paragraph.
 
Now if you find from the evidence beyond a reasonable doubt that
on or about March 1, 2001 and continuing until on or about May 14,
2002 in Fort Bend County, Texas, [appellant] did then and there, on
more than one occasion and pursuant to a common scheme or course of
conduct directed specifically at Sylvia Solis, knowingly engaged [sic]
in conduct that placed Sylvia Solis in fear of bodily injury or death and
that would cause a reasonable person to fear bodily injury or death
namely, by following Sylvia Solis or [sic] sending Sylvia Solis mail or
gifts. [sic]
 
Unless you find and believe beyond a reasonable doubt that the
defendant is guilty under the instructions of either of the two paragraphs
in this numbered paragraph III, then you will find the defendant not
guilty of stalking as charged in the information; or if you have a
reasonable doubt as to whether he is guilty under either of such
instructions, you will find him not guilty of stalking.

          The stalking statute, in contrast to the language of both the information and the
charge’s application paragraphs, provided in pertinent part as follows:
§ 42.072. Stalking
(a)A person commits an offense if the person, on more than
one occasion and pursuant to the same scheme or course of conduct that
is directed specifically at another person, knowingly engages in conduct,
including following the other person, that:
 
(1)the actor knows or reasonably believes the other
person will regard as threatening:
 
(A)bodily injury or death for the other person;
 
. . .
 
(2)causes the other person . . . to be placed in fear of
bodily injury or death . . . ; and

                              (3)     would cause a reasonable person to fear:
 
(A)bodily injury or death for himself or herself;
 
. . . .

Tex. Pen. Code Ann. § 42.072 (emphasis added). As the reporter’s record reveals,
the charge’s application paragraphs were adopted under the assumption that section
42.072(a)’s sub-paragraph (1) established one act that constituted the offense of
stalking, while sub-paragraphs (2) and (3) together established another act
constituting the offense of stalking. Appellant (both in the trial court and here) and
the State (here, though not in the trial court) argue that the three sub-paragraphs of
section 42.072(a) each constitute an element of the single offense of stalking.
          We agree with the parties’ position on appeal that sub-paragraphs (1), (2), and
(3) of section 42.072(a) are each elements of a single offense. This assumption is
supported by the statute’s grammatical structure and by the circumstances under
which the current statute was adopted. The stalking statute’s grammatical structure
is as follows: 
a person commits an offense by knowingly engaging in certain conduct
that [subordinate clause]; [subordinate clause]; and [subordinate clause].

The use of semi-colons to divide the three clauses, the use of the conjunction “and”
between the last two clauses, the three clauses’ modifying the same noun (“conduct”),
and the clauses’ having parallel numbering all show that the three clauses are equal
elements that together define one offense. In contrast, if the Legislature had intended
for the statute to have the meaning adopted in the trial court’s charge, it would have
structured the statute as follows: 
a person commits an offense by knowingly engaging in certain conduct
that [subordinate clause] or [subordinate clause] and [subordinate
clause].

That structure simply cannot be read into the plain language of this statute.
          More importantly, however, the current statute must be read with an eye toward
the circumstances under which it was adopted, a major part of which was the Court
of Criminal Appeals’s interpretation of the stalking statute’s predecessors. See Long
v. State, 931 S.W.2d 285 (Tex. Crim. App. 1996). Section 42.072’s 1993 predecessor
provided as follows:
A person commits an offense if, with intent to harass, annoy, alarm,
abuse, torment, or embarrass another, he . . . on more than one occasion
engages in conduct directed specifically toward the other person,
including following that person, that is reasonably likely to harass,
annoy, alarm, abuse, torment, or embarrass that person; [and] on at least
one of those occasions by acts or words threatens to inflict bodily injury
on that person or to commit an offense against that person . . . .

Act of Mar. 10, 1993, 73rd Leg., R.S., ch. 10, § 1,1993 Tex. Gen. Laws 46, 47,
amended by Act of May 19, 1995, 74th Leg., R.S., ch. 657, § 2, 1995 Tex. Gen. Laws
3625, 3626, repealed & renumbered by Act of Jan. 27, 1997, 75th Leg., R.S., ch. 1,
§ 10, 1997 Tex. Gen. Laws 1, 3 (current version at Tex. Pen. Code Ann. §
42.072(a)). The Long court held that the above predecessor statute was
unconstitutionally vague on its face because, among other things, (1) the terms
“annoy” and “alarm,” which another court had already held to be unconstitutionally
vague, were now joined disjunctively with terms like “harass,” “abuse,” “torment,”
and “embarrass”; (2) the prohibited conduct included any conduct that could cause
the resultant emotions; (3) no reasonable-person standard existed in the statute; (4)
although at least two instances of conduct had to have occurred, only one of those
needed to have threatened bodily injury or death, and the predicate acts did not need
to relate to each other in any fashion; and (5) the First Amendment did not allow an
offense to be created by adding unrelated, protected activity to a criminal act. Long,
931 S.W.2d at 289-94. To remedy these infirmities, the Long court suggested,
implicitly or expressly, that, among other things, a reasonable-person standard be
adopted; the prohibited conduct be limited to that done with intent to inflict fear of
bodily injury or death, to avoid First Amendment complications; the predicate acts
be related to each other; and low-intensity emotional states—like “annoy,”
“embarrass,” “harass,” “alarm,” “abuse,” and “torment”—either be eliminated or
limited statutorily so that they did not implicate First Amendment freedoms. See id.
at 289, 291, 293-94, 296.
          The stalking statute applicable to this case was adopted in 1997 “[w]ith the
Long decision in mind . . . .” Clements v. State, 19 S.W.3d 442, 450 (Tex.
App.—Houston [1st Dist.] 2000, no pet.). In the statute at issue here, “[t]he
legislature incorporated many of the suggestions” made by the Long court, such as
adopting a reasonable-person standard, eliminating all conduct that had been found
vague (“annoy,” “embarrass,” “harass,” “alarm,” “abuse,” and “torment”), and
requiring a nexus among predicate acts. See id. at 450, 451. The Legislature also
limited the prohibited conduct (and its mens rea element) to that conduct threatening
bodily injury or death. See Long, 931 S.W.2d at 293 (noting that other jurisdictions’
stalking statutes so limited their statutes’ mens rea requirements, so that First
Amendment would not be implicated for that conduct). Were we to read sub-paragraph (a)(1) separately from sub-paragraphs (a)(2) and (a)(3)—so that sub-paragraph (a)(1) defined an independent act constituting stalking—we would
eliminate entirely the objective, reasonable-person standard from that offense. 
Compare Tex. Pen. Code Ann. § 42.072(a)(1) (not containing objective, reasonable-person standard, but instead requiring only actor’s belief or reasonable belief that
victim will regard conduct as threatening bodily injury or death) with id. §
42.072(a)(3) (requiring that conduct be such that reasonable person would fear
bodily injury or death for himself or herself). Therefore, reading the statute as did the
trial court and State below would leave in place a potential vagueness deficiency that
our Court has already held was corrected by the 1997 statute. See Clements, 19
S.W.3d at 450, 451. We decline to read the statute in a way that conflicts both with
its plain reading and with the precedent of this Court.
          Finally, the sparse case law considering the statute supports our interpretation. 
Although no court has expressly held that sub-paragraphs (a)(1) through (a)(3) are
elements of a single offense, at least one court has so assumed without deciding. See
Battles v. State, 45 S.W.3d 694, 700 (Tex. App.—Tyler 2001, no pet.) (indicating that
State needed to prove all three matters under information in that case). Our opinion
in Clements is not to the contrary. In Clements, in rejecting a facial vagueness
challenge, we reasoned:
The language of the 1997 statute is not unconstitutionally vague. We
find this statute to thoroughly specify what conduct is prohibited and
subject to prosecution. For example, one way in which a person can be
convicted of stalking is by engaging in conduct he knows or reasonably
believes will be regarded by the other person as threatening bodily
injury or death. Tex. Penal Code Ann. § 42.072(a)(1)(A). It can also
be an offense under the statute for a person to knowingly engage in
conduct that would cause a reasonable person to fear bodily injury or
death. Tex. Penal Code Ann. § 42.072(a)(3)(A). Therefore, the stalker
is on notice of the prohibited conduct if he knows or believes the other
person will regard that conduct as threatening bodily injury or death. As
such, the previous vagueness problem no longer exists.

Id., 19 S.W.3d at 450-51 (emphasis added). The point of the quoted text was to
explain why the statute was not vague on its face. The point was not to imply that
each of the stalking statute’s sub-paragraphs (a)(1), (a)(2), and (a)(3) established a
different act that could independently constitute the offense of stalking, and we
disavow any reading of Clements that would support such an implication.
          We hold that the trial court erred in charging the statutory elements
disjunctively, so that the charge allowed the jury to find appellant guilty upon finding
fewer than all of the elements of the offense of stalking.
B.      Harm
          “[J]ury charge error requires reversal when the defendant has properly objected
to the charge and we find ‘some harm’ to his rights.” Ngo v. State, 175 S.W.3d 738,
743 (Tex. Crim. App. 2005) (quoting Almanza v. State, 686 S.W.2d 157, 171 (Tex.
Crim. App. 1985)). We hold that the record reveals some actual harm. See Arline v.
State, 721 S.W.2d 348, 351 (Tex. Crim. App. 1986) (indicating that, when defendant
objects to charge error in trial court, appellate court must determine whether
defendant “suffered ‘some’ actual, rather than theoretical, harm from the error.”). The
faulty information was read to the jury when appellant was arraigned. More
importantly, in closing argument, the State more than once emphasized that appellant
could be convicted either for having committed the specified acts under section
42.072(a)(1) or for those committed under section 42.072(a)(2) and (3). That is, the
State emphasized the charge’s erroneous disjunctive language. Given this record, we
hold that appellant experienced some harm to his rights because of the charging error. 
Cf. Ngo, 175 S.W.3d at 750 (holding that egregious harm occurred when, among
other things, prosecutor twice told jury that it could convict even if verdict was not
unanimous). 
          We sustain appellant’s issue four.
Legal Sufficiency
          In issue one, appellant argues that the evidence was legally insufficient to
support his stalking conviction.
          In a legal-sufficiency review, we view the evidence in the light most favorable
to the verdict and determine whether any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt. King v. State, 29 S.W.3d
556, 562 (Tex. Crim. App. 2000); Johnson v. State, 23 S.W.3d 1,7 (Tex. Crim. App.
2000). We must not substitute our own judgment for that of the fact finder, which is
entitled to believe all, some, or none of any witness’s testimony. Jones v. State, 944
S.W.2d 642, 648 (Tex. Crim. App. 1996); Sharp v. State, 707 S.W.2d 611, 614 (Tex.
Crim. App. 1986).
          We measure evidentiary sufficiency against the elements of the offense as
defined by the hypothetically correct jury charge. Malik v. State, 953 S.W.2d 234,
239-40 (Tex. Crim. App. 1997); Sisk v. State, 74 S.W.3d 893, 897 (Tex. App.—Fort
Worth 2002, no pet.) (applying Malik to legal-sufficiency challenge in stalking case). 
The hypothetically correct jury charge sets out the law, is authorized by the
indictment, does not unnecessarily increase the State’s burden of proof or
unnecessarily restrict the State’s theories of liability, and adequately describes the
particular offense for which the defendant was tried. Malik, 953 S.W.2d at 240. 
          As explained above in our discussion of jury-charge error, the hypothetically
correct jury charge in this case would have required the State to prove that appellant
(1) on more than one occasion and pursuant to the same scheme or course of conduct
that was directed specifically at Solis (2) knowingly engaged in conduct, including
following Solis, (3) that he knew or reasonably believed that Solis would regard as
threatening bodily injury or death to her, (4) that caused Solis to be placed in fear of
bodily injury or death, and (5) that would cause a reasonable person to fear bodily
injury or death for herself.


 See Tex. Pen. Code Ann. § 42.072(a)(1)(A), (2), (3)(A). 
It is against this statutory paradigm that we gauge the sufficiency of the evidence.
A.      “On more than one occasion and pursuant to the same scheme or course
of conduct that was directed specifically at Solis”

          Appellant was charged with stalking Solis from March 1, 2001 through May
14, 2002. The undisputed evidence showed, among other things, that from at least
August, September, or October 2001 through May 2002, appellant repeatedly sent
flowers, letters, gifts, and cards to Solis—eventually almost daily—and that he
actually called and went to her mother’s place of business, when Solis and her mother
had the same first and last name. The jury could rationally have believed that these
actions constituted a course of conduct, occurring on more than one occasion, that
was directed specifically at Solis.
B.      “Knowingly engaged in conduct, including following Solis”
          Appellant repeatedly sent flowers, letters, gifts, and cards to Solis, eventually
almost daily, and went to and called her mother’s place of business. Once, appellant
placed a gift on the car of Solis’s friend, which was the same color as Solis’s car, and
which the jury could rationally have believed that appellant thought was actually
Solis’s car. After Solis first reported appellant’s behavior to a church elder, Leon
Kinloch, in either June or in the Fall of 2001,


 the church elders decided to “monitor
the situation” and to try to prevent appellant from sitting near Solis. However, they
were unsuccessful at preventing his approaching her: “on multiple occasions,”
appellant would position himself “to either get in close proximity to [Solis] to pass
her notes or to get in her line of sight to establish some sort of—what appeared to be
to try to establish some sort of eye contact.” After the elders had asked him to leave
the congregation because of his actions toward Solis, appellant “often would drive
through the parking lot of our Kingdom Hall”; after the elders told him not to drive
through the parking lot, appellant at least once stood in another church’s nearby
parking lot in sight of those (including Solis) exiting the church. Solis testified that
she believed that appellant was waiting specifically for her because he “kept staring
at me . . . ,” although she followed up by admitting that she did not know whether he
was actually waiting for her. Finally, Elder Kinloch explained that Solis had come
to him in the Fall of 2001 complaining that “according to her, [appellant had] been
following her.”
          We give the term “following” its plain meaning. See Clements, 19 S.W.3d at
448. Applying that plain meaning, the jury could rationally have believed that
appellant’s conduct set out above constituted following Solis.
C.      “That appellant knew or reasonably believed that Solis would regard as
threatening bodily injury or death to her”
          There was evidence from which the jury could rationally have concluded that
Solis exhibited behavior objectively demonstrating an extreme fear of appellant’s
conduct. For example, when Solis approached Officer Darren Veazy on January 29,
2002 with her first complaint about appellant’s behavior, Officer Veazy observed that
Solis was “terrified that [appellant] would not leave her alone,” “terrified of what this
guy was doing,” and “terrified of what [his] next action would be”; that she was
“extremely scared,” “scared to death,” and “frightened”; that she “was visibly shaken
[and] upset”; and that “her voice was quivering.” Officer L.R. Roman, the second
officer to interview Solis, described Solis’s demeanor in March 2002, when Solis
made a second complaint about appellant, as “scared.”
          Similarly, when Solis first reported appellant’s behavior to church Elder
Kinloch in either June or in the Fall of 2001, Elder Kinloch described Solis’s
demeanor as “very concerned.” Elder Kinloch described Solis’s demeanor during the
period that the church’s “monitoring” period and afterwards as “very, very
concerned,” “very, very jittery and jumpy,” “incredibly nervous,” “consistently
nervous,” “extremely jumpy,” and “maybe even frightened so much so that she was
hesitant to attend meetings,” “so fearful of the situation that she actually stopped
coming to the Kingdom Hall,” “afraid of her shadow,” and “consistently in fear of
someone coming up behind her.” The elder explained that Solis’s demeanor over the
last three years had changed “dramatically.”
          And there was more evidence of Solis’s manifestation of fear. Solis’s mother
explained that, because of appellant’s advances, Solis started “getting scared to go to
the gym,” feeling that “[m]aybe there’s a possibility that . . . he knows exactly where
I go and I can be followed,” getting “really worried about it,” thinking “that maybe
someone was following her,” and being “a nervous wreck.” In a letter dated April 29,
2002, appellant admitted that, when he once touched Solis’s arm at church with a
notepad, she “jumped about a foot and a half into the air” and “said something like,
oooooughhhhhuh.” Solis confirmed that she had been scared during the incident that
appellant’s letter recounted.
          The jury also heard evidence that appellant was told that his conduct was
seriously frightening Solis and that he should leave her alone. For example, on
January 29, 2002, Officer Veazy told appellant that his actions were “terrifying”
Solis, that “she didn’t want any contact with him,” and that “he should just leave her
alone.” The officer also told appellant that night that if appellant’s conduct
continued, the officer would send a report “to the DA for stalking.” In addition to
Officer Veazy’s doing so, Elder Kinloch talked to appellant about the situation,
asking him to stop sending Solis things, at least once in November or December 2001
and possibly more than once. When appellant’s behavior toward Solis continued, the
church elders eventually asked appellant to leave the congregation.
          From this evidence—both of Solis’s manifestations of fear and of appellant’s
being told directly of the effect that his conduct was having on Solis—the jury
rationally could have concluded that appellant either knew or should have known that
Solis would regard his conduct as threatening bodily injury or death to her.
D.      “That caused Solis to be placed in fear of bodily injury or death”
          Contrary to appellant’s suggestion in his brief, Solis testified expressly that she
feared that appellant would cause her death or bodily injury because of his behavior. 
This testimony sufficed to support the jury’s implicit finding of this element.



E.      “That would cause a reasonable person to fear bodily injury or death for
herself”
          Solis had never even spoken to appellant, encouraged appellant to take any
interest in her, or had any contact with appellant (except for her written refusals to
have lunch with him the very first time that he sent her notes) at any time before or
after he began his efforts in March 2001. Nonetheless, starting in August, September,
or October 2001, appellant repeatedly and persistently—and, later, even
daily—pursued Solis through letters, cards, flowers, and gifts. Appellant called and
came to Solis’s mother’s store and left things in the mailbox there. Appellant’s letters
used language that one might use if one were intimate with someone or knew that
person extremely well, stating that he and Solis would marry, referring to their
children and grandchildren, and often speaking in language that indicated that he
believed that their love was deep and mutual and that their marriage was a fait
accompli. Appellant also referred to Solis’s buttocks, to wanting to see her breasts,
and to how they would keep his bedroom busy after they were married—all without
her having spoken even one word to him.
          Even after Elder Kinloch had told him to leave Solis alone and to leave the
congregation, appellant “often would drive through the parking lot of our Kingdom
Hall” and at least once stood nearby in sight of those (including Solis) exiting the
church. Appellant’s efforts became more frequent as time went on, and he continued
his conduct even after he had been advised by Officer Veazy (January 2002) and
Elder Kinloch (Fall of 2001) that Solis was terrified or did not welcome his advances
and that he should leave her alone; even after he had been expelled from the church
because of his behavior toward Solis; and even after he had been arrested for this
offense.
          Even as early as January 2002, Officer Veazy was “concerned” with appellant’s
behavior because “[i]t just wasn’t normal” and because appellant had admitted
already having watched Solis for a very long time. The officer also opined that,
although Solis did not mention on her first visit to him that appellant had injured or
threatened to injure her, the officer “could understand where [Solis] was coming
from,” given appellant’s conduct. As for appellant’s conduct at church meetings,
Solis explained: “[W]e even got up to move [at church] and he kind of just got mad
and he, you know, stormed out a couple of times when the Elders told him, you know,
‘You can’t sit there’ or ‘You can’t do that.’” Most importantly, the following
exchange occurred during cross-examination of Elder Kinloch:
Q:Do you really think that I would physically harm the lady?



 
A:Yes.
 
Q:Why do you so answer? You saw nothing in the cards, nothing
there that indicates harm?
 
A:Your interactions with me—with me, being a fairly good-sized
male, indicated that, when you disagreed or someone disagreed
with you, you demonstrated a loss of temper.

(Emphasis added.)
          Given the above testimony, the jury rationally could have concluded that the
frequency, escalation, content, and unsolicited nature of appellant’s conduct, as well
as his display of at least some anger when others disagreed with him or prevented his
sitting near Solis, would have caused a reasonable person to fear bodily injury or
death for herself.
F.      Conclusion Concerning Legal Sufficiency
          We hold that the evidence was legally sufficient to support each element of the
offense as set out in the hypothetically correct charge for stalking.
          Accordingly, we overrule issue one.



 
Constitutionality
          In issue three, appellant asserts that the stalking statute is unconstitutional on
its face and as applied to him.
          “All laws carry a presumption of validity.” Clements, 19 S.W.3d at 450
(considering facial vagueness and overbreadth challenges to current stalking statute). 
“The party challenging a statute has the burden to establish its unconstitutionality.” 
Id. “We uphold the statute if we can determine a reasonable construction that will
render it constitutional and carry out the legislative intent.” Lewis v. State, 88 S.W.3d
383, 392 (Tex. App.—Fort Worth 2002, pet. ref’d) (so providing in case considering
facial constitutionality of current stalking statute). 
          To prevail in a facial constitutional challenge, one must generally show that
there is no set of circumstances under which the statute would be constitutional. 
Briggs v. State, 789 S.W.2d 918, 923 (Tex. Crim. App. 1990) . However, “it has been
suggested by the [United States] Supreme Court that in situations where a law reaches
a ‘substantial amount of constitutionally protected conduct’ a facial challenge can be
made to the statute even when it conceivably could have some valid applications.”
State v. Markovich, 77 S.W.3d 274, 279 (Tex. Crim. App. 2002) (quoting Kolender
v. Lawson, 461 U.S. 352, 358 n.8, 103 S. Ct. 1855, 1859 n.8 (1983)); Sanchez v.
State, 995 S.W.2d 677, 683 (Tex. Crim. App. 1999) (indicating that “under the First
Amendment, a statute may be subject to a facial challenge even though it may have
some legitimate application, but absent the First Amendment, ‘a facial challenge
could be mounted successfully only if the statute were vague in all of its
applications.’”) (quoting Long, 931 S.W.2d at 295). In an as-applied constitutional
challenge, in contrast, a defendant asserts that, as applied to him in his situation, the
statute is unconstitutional. Bynum v. State, 767 S.W.2d 769, 774 (Tex. Crim. App.
1989).
A.      Overbreadth
          A statute is unconstitutionally overbroad if “in its reach it prohibits
constitutionally protected conduct.” Clements, 19 S.W.3d at 451. Nonetheless, for
a facial overbreadth challenge to succeed, the statute “must reach a substantial
amount of protected conduct,” as even protected speech may be regulated to some
degree. Id. For purposes of an overbreadth challenge, “while conduct does not lose
First Amendment protection merely because the actor intends to annoy the recipient,
such conduct is much less likely to enjoy protection where the actor intends to
‘frighten’ the recipient, and such conduct is unlikely to enjoy any protection where
the actor intends to place the recipient in fear of death or bodily injury.” Long, 931
S.W.2d at 293 (emphasis added); see Clements, 19 S.W.3d at 451.
          1.       Facial Challenge
          Appellant argues that the current stalking statute is facially overbroad because
it (1) does not describe “[t]he type of prohibited conduct”; (2) does not define
“following”; (3) allows non-threatening conduct that could be protected under the
First Amendment to be converted into an offense once a threat is made; and (4) is
“not saved by its attempt to insert a reasonable person standard” because it does not
specify from whose perspective the conduct must be reasonable. We disagree.
          First, this Court, in Clements, expressly rejected appellant’s argument (3). See
id. at 451 (indicating that current statute addressed Long court’s overbreadth concerns
by prohibiting only conduct causing fear of bodily injury or death, which fell outside
First Amendment protection, and by requiring nexus among all acts constituting
offense); accord Lewis, 88 S.W.3d at 392. Second, the Clements court also implicitly
rejected appellant’s argument (1) because, in considering a facial vagueness
challenge, the Court indicated that the statute “thoroughly specif[ies] what conduct
is prohibited and subject to prosecution.” Id. at 450; see Lewis, 88 S.W.3d at 392 (“A
person who knows or reasonably believes his conduct will be regarded as threatening
bodily injury or death is necessarily on notice that his conduct is prohibited.”); see
also State v. Seibert, 156 S.W.3d 32, 37 (Tex. App.—Dallas 2004, no pet.) (In
reversing trial court’s order quashing indictment, stating that “[a] statute is not
rendered unconstitutionally vague merely because words or terms are not specifically
defined.”; rejecting defendant’s argument that undefined term “follow” in stalking
statute rendered statute unconstitutionally vague on face; and holding that “[t]he term
‘following,’ alleged in the indictment, is not so broad as to encompass non-criminal
activities.”). We decline to revisit the conclusions reached in Clements. Third, the
lack of a definition for “follow” does not render the statute facially overbroad
because, among other things, that conduct must still have a nexus with the conduct
in which bodily injury or death is threatened and feared. See Tex. Pen. Code Ann.
§ 42.072(a) (requiring the multiple acts to be “pursuant to the same scheme or course
of conduct” as that in which bodily injury or death is threatened and feared); cf.
Clements, 19 S.W.3d at 448 (applying plain meaning of “follow” in context of legal-sufficiency review). As for appellant’s argument (4), the statute does indicate from
whose perspective each element of the offense is to be viewed:
●The first element is viewed from the actor’s perspective. See id.
§ 42.072(a)(1) (prohibiting knowing engagement in conduct that
“the actor knows or reasonably believes [the victim] will regard
as . . . threatening bodily injury or death for [the victim] . . . .”).
 
●The second element is viewed from the victim’s perspective. See
id. § 42.072(a)(2) (providing that the actor’s conduct must
“cause[] the [victim] . . . to be placed in fear of bodily injury or
death . . . .”).
 
●The third element is viewed from the reasonable person’s
perspective. See id. § 42.072(a)(3) (providing that actor’s
conduct must be such that “would cause a reasonable person to
fear. . . bodily injury or death for himself or herself . . . .”).
 
          2.       As-Applied Challenge
          Appellant’s only argument that the stalking statute is overbroad as applied to
him is that he was only attempting to court Solis, a protected exercise of his First
Amendment rights, and never threatened, harmed, or intended to frighten her. Given
the facts as set out above, however, appellant’s continuing his conduct after, for
example, having been advised by two sources that he was terrifying Solis or that his
advances were unwelcome and should be stopped removes his actions from the First
Amendment protection, or at least prevents the stalking statute from curtailing a
substantial amount of protected conduct in appellant’s case. See Clements, 19 S.W.3d
at 451. Furthermore, the jury rationally could have believed that the evidence, as set
out above, surpassed mere courting.
B.      Vagueness
          To survive a challenge that it is unconstitutionally vague, “a criminal statute
must give a person of ordinary intelligence a reasonable opportunity to know what
is prohibited.” Id. at 451 (citing Grayned v. City of Rockford, 408 U.S. 104, 108-09,
92 S. Ct. 2294, 2298-99 (1972)). Additionally, the statute “must establish
determinate guidelines for law enforcement.” Long, 931 S.W.2d at 287. Finally,
when First Amendment rights are implicated, “the law must be sufficiently definite
to avoid chilling protected expression,” that is, the law’s specificity must be greater
than would be required in other contexts. Long, 931 S.W.2d at 287; Clements, 19
S.W.3d at 450. As with an overbreadth challenge, in a vagueness challenge, “conduct
is much less likely to enjoy [First Amendment] protection where the actor intends to
‘frighten’ the recipient, and . . . is unlikely to enjoy any protection where the actor
intends to place the recipient in fear of death or bodily injury.” Long, 931 S.W.2d at
293 (recognizing same with regard to facial vagueness challenge to stalking statute).
          1.       Facial Challenge
          Appellant argues that the stalking statute is facially vague because it (1) “fails
to give fair notice of what conduct may be permitted, forcing people to guess at the
statute’s meaning, and threatening to trap the innocent” who might simply be
persistent in courtship and (2) “fail[s] to establish guidelines for those charged with
enforcing the law . . . .”
          This Court has already rejected a facial vagueness challenge to the stalking
statute:
The language of the 1997 statute is not unconstitutionally vague. We
find this statute to thoroughly specify what conduct is prohibited and
subject to prosecution. . . . [T]he stalker is on notice of the prohibited
conduct if he knows or believes the other person will regard that conduct
as threatening bodily injury or death. As such, the previous vagueness
problem no longer exists.

Clements, 19 S.W.3d at 450-51 (citations omitted). We decline to revisit that holding,
with which other courts have agreed. See Seibert, 156 S.W.3d at 37; Lewis, 88
S.W.3d at 392 (“Conduct enjoys no First Amendment protection when the actor
intends to place the recipient in fear of bodily injury or death. . . . A person who
knows or reasonably believes his conduct will be regarded as threatening bodily
injury or death is necessarily on notice that his conduct is prohibited.”); Sisk, 74
S.W.3d at 901-02. Moreover, the Clements Court also rejected an argument—akin
to appellant’s argument here that the statute does not give notice that persistent
courtship might, under the specified circumstances, constitute an offense—that the
statute was facially vague because it “impinged upon the marriage relationship” and
“prohibit[ed] [Clements’s] constitutionally protected conduct of attempting to ‘save’
his marriage.” Id. at 449, 451. The Court rejected this argument because, as it
expressly held in another portion of the opinion, the statute required that the actor
know or reasonably believe that the victim would regard his conduct as threatening
bodily injury or death and because such conduct enjoyed no First Amendment
protection. See id. at 450-51; see also Tex. Pen. Code Ann. § 42.072(a)(1)-(3). 
Similarly, within the current statute, the “bodily injury or death” limitation, as well
as the “pursuant to the same scheme or course of conduct” requirement, establish a
determinate guideline for law enforcement: mere courtship alone, even persistent
courtship, does not suffice. See Battles, 45 S.W.3d at 703 (holding that term
“pursuant to the same scheme or course of conduct” establishes determinate
guidelines for law enforcement); Sisk, 74 S.W.3d at 901 (holding that stalking statute
establishes determinate guidelines for law enforcement); see also Long, 931 S.W.2d
at 293-94 (suggesting that limiting former stalking statute to bodily-injury-or-death
situation might help cure facial vagueness problem).
          2.       As-Applied Challenge
          Appellant alternatively argues that the statute was vague as applied to him
because “[a]ppellant, the police, the prosecution, and the jury were all left to
speculate about whether a crime had occurred.”
          For example, appellant points to Officer Veazy’s testimony that, when Solis
first approached him on January 29, 2002, the officer “wasn’t quite sure if
[appellant’s conduct had] met the elements of any crime.”


 However, Officer Veazy’s cited testimony might be explained by, as he also
indicated, his not filing “many stalking cases”—that is, his lack of experience with
the offense itself, rather than the statute’s failure to give “determinate guidelines for
law enforcement.” See Long, 931 S.W.2d at 287. In any event, we hold that
appellant had sufficient “opportunity to know what [wa]s prohibited” under the facts
of this case. See Clements, 19 S.W.3d at 450 (requiring, to avoid vagueness
challenge, that criminal statute provide such notice). By January 29, 2002, both
Officer Veazy and the Elder Kinloch had advised appellant either that he was
terrifying Solis or that he should leave her alone. Appellant nonetheless continued
his behavior after that date. Appellant was surely on notice of “what [wa]s
prohibited” after both the police and his elder had advised him of the detrimental
effects of his behavior on Solis and had warned him to cease his actions. See id. 
Moreover, the jury could rationally have believed that Solis objectively manifested
signs of extreme fear at appellant’s behavior, which would also have placed him on
notice.



          Appellant also relies on the jury’s having sent a note asking why it took from
January 2002 until March 2002 to file charges. Because it is unclear why the jury
asked this question, the note does not show that the jury found the statutory language
too vague to apply in appellant’s case.
C.      Conclusion Concerning Constitutionality
          We overrule issue three in its entirety.

Conclusion
          We reverse the judgment of the trial court and remand the cause.
 
 
Tim Taft
Justice
 
Panel consists of Justices Taft, Keyes, and Hanks.
Publish. See Tex. R. App. P. 47.2(b).